754 F.2d 512
 80 A.L.R.Fed. 879, 17 Fed. R. Evid. Serv. 433
 Melissa E. DeBENEDETTO, a minor by her Guardian ad Litem,
Frances DeBENEDETTO, Appellant,
v.
The GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation, Appellee.
Deborah Samluk DRIER, Appellant,
v.
The GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation, Appellee.
 Nos. 83-1028(L), 83-1029.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1984.
Decided Jan. 16, 1985.
 
 1
 George E. Campsen, Jr., Charleston, S.C. (Fred Thompson, III, Charleston, S.C., on brief), for appellants.
 
 
 2
 Robert H. Hood, Charleston, S.C. (V. Claire Allen, Sincker Gibbs & Simons, Charleston, S.C., on brief), for appellee.
 
 
 3
 Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and MICHAEL,* District Judge.
 
 MICHAEL, District Judge:
 
 4
 Deborah Samluck Drier and Melissa E. DeBenedetto (by her guardian ad Litem, Frances DeBenedetto) appeal from the jury verdict in favor of the defendant Goodyear Tire & Rubber Company (Goodyear) in these consolidated product liability cases. Appellants assert that the trial court committed three reversible errors in the conduct of the trial: (1) seating an eight-member jury, with seven of those jurors deliberating; (2) allowing the jurors to question witnesses during the trial; and (3) refusing to allow publication of certain interrogatories and answers by the defendant. Appellants further claim that they were deprived of a fair trial by the defendant's failure to produce a specified document during discovery and by statements made by defense counsel during closing argument. Despite the reservations stated herein about the practice of allowing questions by jurors, we find no reversible error.
 
 I.
 
 5
 The jury for the trial of these consolidated cases was selected on October 4, 1982. The trial began on October 11, 1982, and ended on October 29, 1982. Prior to the jury selection, the trial judge fully explained to counsel and to the venire the procedure to be followed. Sixteen names were drawn from the jury venire. Each side was allowed four strikes, resulting in an eight-member jury, none of whom was designated as an alternate. The trial judge indicated that all eight jurors would deliberate if they were present at the close of the case. Neither counsel objected to this procedure.
 
 
 6
 On the second day of the trial, counsel for the defendant revealed a previously undisclosed conflict of interest involving one of the jurors. The trial judge did not excuse the juror on that day but, upon further consideration of the matter, excused the juror the following morning. Goodyear moved for a mistrial based on the number of jurors. The trial judge denied Goodyear's motion and the trial continued with a seven-member jury. All seven jurors deliberated and reached a verdict for Goodyear. Appellants DeBenedetto and Drier now assert that the departure from the standard jury size without the written agreement of counsel is error per se.
 
 
 7
 Fed.R.Civ.P. 48 allows the parties to stipulate to a jury of any number less than twelve. However, in 1978, the District of South Carolina adopted a local rule which states:
 
 
 8
 In all civil cases tried in the United States District Courts for the District of South Carolina, the issues may be submitted to juries of six (6) or twelve (12) jurors, at the discretion of the trial judge.
 
 
 9
 In Kuykendall v. Southern Railway Co., 652 F.2d 391, 392 (4th Cir.1981), this court held that departures from these authorized jury sizes are permitted only "by a written stipulation or one clearly recorded". There was no written stipulation regarding the jury size in this case. The issue, therefore, is whether there was a "clearly recorded" agreement to the departure from the local rule.
 
 
 10
 There is no question but that the trial judge clearly explained the intended procedure for the jury selection and deliberation. Counsel made no objection at that time; only after the eighth juror was excused did counsel for Goodyear protest. This objection reflects the understanding that all eight jurors would deliberate at the close of the case. At no time did counsel for DeBenedetto and Drier question the jury composition.
 
 
 11
 Appellants insist that their silence cannot be construed as a "clearly recorded" agreement on the jury size. However, the "clearly recorded" requirement must be viewed in light of the concerns expressed by the Kuykendall court. Those concerns were succinctly stated as follows:
 
 
 12
 If there is to be departure from established procedures, misunderstandings by lawyers to the possible disadvantage of their clients can be avoided only if the departure is by a written stipulation or one clearly recorded.
 
 
 13
 652 F.2d at 392. Unlike Kuykendall, where defense counsel understood that there were six jurors and two alternates rather than eight regular jurors, there is nothing in the record of this case to indicate--and counsel do not argue--that anyone assumed that the seventh and eighth jurors were alternates. Regardless of whether assent through silence will always satisfy Kuykendall, in this case there was no misunderstanding and, therefore, no prejudicial harm.
 
 
 14
 Appellants rely on United States v. Chatman, 584 F.2d 1358 (4th Cir.1978), and United States v. Virginia Erection Corp., 335 F.2d 868 (4th Cir.1964), as support for their contention of per se error. Those cases involve deliberation by an unauthorized person and are inapplicable to this case where all persons deliberating were authorized jurors.
 
 II.
 
 15
 The second assignment of error is based on the trial court's decision allowing jurors to question witnesses.[1] Appellants maintain that since the Federal Rules of Evidence do not explicitly permit this practice, it is error for a trial court to permit it.
 
 
 16
 First, as an important point in the ultimate decision on this issue, we note that appellants did not object during the trial either to the policy of allowing questions by jurors or to any specific juror question. Appellants indicate that they did not object because they did not want to risk alienating the jury. This argument has some merit with regard to objections to a specific question. However, counsel certainly must have had opportunities during a three-week trial to object and to put on the record--outside the presence of the jury--their objection to an individual question or to the entire practice of juror questioning. Where there is no objection in trial below, this court ordinarily does not consider the issue. Nevertheless, because of the way we view this matter, we address the merits of this issue.
 
 
 17
 The Federal Rules of Evidence neither explicitly allow nor disallow the practice of permitting jurors to question witnesses. The only guidance to be found is in Fed.R.Evid. 611(a) which instructs the court to "exercise reasonable control over the mode and order of interrogating witnesses...." Those courts considering the propriety of juror questions have concluded that it is a matter within the discretion of the trial judge. See, e.g., United States v. Callahan, 588 F.2d 1078 (5th Cir.), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); United States v. Witt, 215 F.2d 580 (2d Cir.), cert. denied, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954). In Callahan, the court advised the jury, before opening statements, that it would permit jurors to submit in writing to the court any question a juror might wish to put to a witness, and, if not legally improper, the judge would put the question to the witness. Only one question from a juror was thus submitted; this question was "relatively innocuous and could have had no measurable impact on the outcome". 588 F.2d at 1086. In Witt, the opinion recites only that: "During the trial, some of the jurors, with the judge's consent, put questions to witnesses and received answers. We think that a matter within the judge's discretion like witness-questioning by the judge himself, ...." 215 F.2d at 584. The brevity of the treatment of the point in the Witt opinion may well indicate that the appellate court considered the questions to be of the same "relatively innocuous" character as the questions in Callahan.
 
 
 18
 While we agree that allowing juror questions is a matter within the discretion of the trial court, we do not agree that such questions are analogous to or even comparable to questioning of witnesses by the judge. Suffice it to say that the judge is not "an umpire or ... moderator at a town meeting," but he sits "to see that justice is done in the cases heard before him." United States v. Rosenberg, 195 F.2d 583, 594 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952), quoting Simon v. United States, 123 F.2d 80, 83 (4th Cir.), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941). One simply cannot compare the questioning by the trial judge--who is trained in the law and instructed to "see that justice is done"--with the questioning by members of the jury--who are untutored in the law, and instructed to sit as a neutral fact-finding body. Thus, we believe that juror questioning and questioning by the trial judge are clearly and properly distinguishable, although both forms of questioning are matters within the trial court's discretion.
 
 
 19
 Notwithstanding our belief that juror questioning is a matter within the trial court's discretion, we believe that the practice of juror questioning is fraught with dangers which can undermine the orderly progress of the trial to verdict. Our judicial system is founded upon the presence of a body constituted as a neutral factfinder to discern the truth from the positions presented by the adverse parties. The law of evidence has as its purpose the provision of a set of rules by which only relevant and admissible evidence is put before that neutral factfinder. Individuals not trained in the law cannot be expected to know and understand what is legally relevant, and perhaps more importantly, what is legally admissible.
 
 
 20
 Since jurors generally are not trained in the law, the potential risk that a juror question will be improper or prejudicial is simply greater than a trial court should take, absent such compelling circumstances as will justify the exercise of that judicial discretion set out above.
 
 
 21
 While the procedure utilized in the trial below permitted screening of the questions before an answer was given, the statement of the question itself was in the hearing of the other jurors, bringing with it the unknown, and perhaps unknowable, mental reactions of those other jurors. In the case where such a question is rejected, not only the questioning juror but the other jurors are likely to retain whatever mind-set has been generated by the question, leaving the court and counsel to ponder, under the stress of trial, how much influence a juror question, answered or unanswered, may have had on the perceptions of the jury as a whole.
 
 
 22
 Although the court can take remedial steps once such an improper or prejudicial question is asked, it is questionable how effective remedial steps are after the jury has heard the question, as noted supra. More importantly, the remedial steps may well make the questioning juror feel abashed and uncomfortable, and perhaps even angry if he feels his pursuit of truth has been thwarted by rules he does not understand. Under the tension and time pressure of a trial, such a reaction is all the more likely. Of course, under the worst case, a juror question may emerge which is so prejudicial as to leave only a declaration of mistrial as an appropriate remedial step, with all the waste that flows from a mistrial.
 
 
 23
 One further aspect of this practice deserves comment. Human nature being what it is, one or two jurors often will be stronger than the other jurors, and will dominate the jury inquiries. Indeed, this appears to have happened in this case, as discussed infra. Moreover, since these questions are from one or more jurors, the possibility that the jury will attach more significance to the answers to these jury questions is great. Every trial judge has noted the development in most lengthy trials of a cohesiveness in the jury as the trial goes on, coming eventually almost to a spirit of camaraderie, in which the actions and reactions of any individual juror are perceived by the jurors as those of the whole jury. In such a setting, the individual juror's question, and the answer elicited, almost certainly will take on a stronger significance to the jury than those questions and answers presented and received in the normal adversarial way.
 
 
 24
 To the extent that such juror questions reflect consideration of the evidence--and such questions inevitably must do so--then, at the least, the questioning juror has begun the deliberating process with his fellow jurors. Certainly, this is not by design, but stating the question and receiving the answer in the hearing of the remaining jurors begins the reasoning process in the minds of the jurors, stimulates further questions among the jurors, whether asked or not, and generally affects the deliberative process.
 
 
 25
 With these concerns in mind, we examine the record to determine whether in this instance appellants were prejudiced by the jurors' questions.
 
 
 26
 There were some 95 questions by jurors during this three-week trial; over half of the questions were asked by the foreman. As noted supra, the foreman's number of questions indicates that he was one of the stronger, more vocal members of the jury. Appellants claim that if nothing else, the sheer volume of juror questions indicates a loss of control by the court, thereby prejudicing the appellants' rights.
 
 
 27
 We have examined carefully each of the questions propounded by jurors and we perceive no bias in any of the questions. The vast majority of the juror questions were technical in nature and reflect a commendable degree of understanding and objectivity by the jury. That such a salutary conclusion is to be reached in this case does not by any means assure that the same or a similar result would come about with other juries.
 
 
 28
 Because we detect no prejudice to any party, and because appellants did not object to the procedure at the time of trial, we do not find error in the use of juror questions in this case. However, for the reasons set out above, such juror questioning is a course fraught with peril for the trial court. No bright-line rule is adopted here, but the dangers in the practice are very considerable.
 
 III.
 
 29
 Appellants next challenge the trial court's refusal to allow publication by delivery in writing to the jury of certain interrogatories to and answers by the defendant Goodyear. Appellants assert that the answers were relevant admissions by the defendant and were a proper basis for impeachment.
 
 
 30
 The interrogatories involved sought information on the manufacture, sale, and availability of the line of tires in question. Goodyear initially denied that any of these tires were available for sale in the United States. After counsel for appellants located and purchased one of the tires, Goodyear filed supplemental answers admitting the availability. Goodyear persisted in its refusal to admit that it sold the specific tire involved in the accident until the fourth day of trial--when appellants attempted to introduce the discovery documents into evidence--when such admission was finally tendered.[2] The trial court determined that the interrogatories and requests for admissions were irrelevant in light of the defendant's admission at trial.
 
 
 31
 Appellants correctly assert that the proof of sale was an essential element of their case. However, the trial court's decision not to allow publication of the interrogatories and answers did not preclude proof of sale or even prohibit the impeachment of Goodyear's credibility. Goodyear admitted at trial that it sold the tire and would be strictly liable for any defect shown. As to the impeachment of Goodyear, the same effort at impeachment could have been made by cross-examining defense witnesses on the responses made to discovery requests.
 
 
 32
 The exclusion of evidence is squarely within the discretion of the trial judge. Reed v. Tiffin Motor Homes, Inc., 697 F.2d 1192 (4th Cir.1982), and cannot be reversed absent abuse of that discretion. We find no abuse of discretion in this instance.
 
 IV.
 
 33
 Appellants next contend that Goodyear's failure to produce a document entitled "Wire Belted Passenger Strip Test" during discovery denied them of a fair trial. They allege that the information contained in the document concerning adhesion problems found in some tires manufactured by Goodyear is highly relevant in proving a manufacturing defect in the steel-belted radial tire which is the subject of these actions. Appellants also claim that the failure to disclose this document establishes the existence of other undisclosed relevant documents.
 
 
 34
 During discovery, Appellants filed a Request for Production which read as follows:
 
 
 35
 Copies of all correspondence, as aforesaid, pertaining to the functionability of all tires manufactured by the Defendant Goodyear and/or any of its subsidiary corporations, which tires were manufactured according to the same or similar specifications as "the tire" described in Plaintiffs' Amended Complaint.
 
 
 36
 Appellants also filed interrogatories regarding adhesion problems in similar tires during the relevant time period. The above-named document was not produced in response to these discovery requests. Its existence was first documented when an expert witness secured by the Appellants produced the document during his testimony at trial. Appellants assert that they were unfairly disadvantaged by their inability to fully use the document for further pre-trial discovery, or for cross-examination and argument at trial.
 
 
 37
 While this document may have been highly relevant, it is by no means clear that the document was encompassed by the discovery requests. Further, nothing in the record establishes that Goodyear knew of the existence of the document during the discovery period.
 
 
 38
 Even assuming that the document was both relevant and encompassed by the discovery requests, appellants must show that they were prejudiced by the late appearance of the document. For several reasons, we find that there was no prejudice to warrant second-guessing the discretion of the trial judge.
 
 
 39
 First, the document surfaced through the testimony of appellants' expert witness. Appellants retained this tire expert more than three years before the trial and there is no explanation in the record for the expert's failure to provide the document to appellants prior to trial. It appears from the record that the document had been in the hands of the expert for a considerable time.
 
 
 40
 Second, although appellants claim that the late appearance of the document precluded full use of it, appellants did in fact utilize the document extensively, both in cross-examining appellee's experts and in closing argument.
 
 
 41
 Finally, appellants did not exercise those options which were available to ameliorate any unfair surprise resulting from the appearance of this document. Appellants could have moved for continuance or sought a recess to conduct discovery on the document before the trial continued. Instead, appellants chose not only to continue with the trial, but to use the document as a surprise weapon against Goodyear. They cannot now be allowed to alter retroactively their trial strategy.
 
 V.
 
 42
 Finally, appellants argue that counsel for Goodyear went beyond the record in closing argument, thus prohibiting a fair trial. Defense counsel argued in closing that the line of tires involved in these actions had never before been the object of a claim. Counsel based this inference on the testimony of an expert witness who stated that he knew of no other recalls, failures, or claims involving this type of tire. Appellants offered no affirmative proof of such previous claims. Appellants objected to this line of argument and the trial judge immediately instructed the jury to disregard that portion of the closing argument.
 
 
 43
 Determining whether the statements of defense counsel were properly drawn inferences from the facts in the record is fundamentally a matter of the trial court's discretion. In reviewing the trial court's decision, this court must first consider whether the action was improper, and then evaluate the adequacy of judicial response. Arnold v. Eastern Air Lines, Inc., 681 F.2d 186 (4th Cir.1982), reh'g en banc, 712 F.2d 899 (1983), cert. denied, --- U.S. ----, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). In reviewing such matters, this court must extend "great deference [to] the superior vantage point of the trial judge..." Arnold, 681 F.2d at 197. Although a reasonable argument can be made that the inferences were entirely proper, the trial judge here found the statements to be beyond the record. He issued a strongly-worded curative instruction which he felt obviated any possible prejudice to appellants. This court agrees that even if the argument was improper, the curative instruction was an adequate response.
 
 For the reasons stated, we
 
 44
 AFFIRM.
 
 
 
 *
 Hon. James H. Michael, Jr., United States District Judge for the Western District of Virginia, sitting by designation
 
 
 [1]
 In his opening comments to the jury, the trial judge expounded his policy of permitting questions by jurors. After counsel completed their examination of a witness, the court allowed jurors to direct questions to the bench. If the trial judge deemed the question proper, he instructed the witness to answer it. Counsel were given the opportunity to re-question each witness after all inquiries from the jury were resolved
 
 
 [2]
 In the interim, Goodyear had taken depositions of the previous owners of the automobile, thereby establishing the chain of custody of the tire from the date of sale to the date of the accident