**UNITED STATES of America, Appellee,**

v.

**Alvin E. JOHNSON, Appellant.**

**No. 89–1024.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 9, 1989.

Decided Dec. 20, 1989.

Rehearing and Rehearing En Banc Denied Feb. 9, 1990.

George A. Wheeler, Kansas City, Mo., for appellant.

Linda L. Parker, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before LAY, SNEED *, and McMILLIAN, Circuit Judges.

SNEED, Senior Circuit Judge:

Alvin E. Johnson appeals following his conviction by jury on September 14, 1988, of two counts of knowingly and intentionally distributing cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The lower court sentenced him to two terms of confinement of 78 months to run concurrently. We affirm.

## I. FACTS AND PROCEEDINGS BELOW

On July 5, 1988, a confidential informant working with the Kansas City, Missouri Police Department agreed to introduce undercover officer Phillip Craig Inman to Johnson for the purpose of arranging a drug sale. That afternoon, the officer and the informant went to the defendant's house, where Inman asked Johnson for one-half ounce of crack cocaine, which Johnson agreed to sell. While they were waiting for delivery of the drugs, the officer mentioned that he might be willing to purchase a kilogram at a later time. Johnson replied that his source could supply any quantity desired.

On July 7, 1989, when Inman telephoned the appellant, Johnson at his own initiative asked whether Inman was still interested in purchasing narcotics. They discussed delivery terms and various prices for varying amounts of cocaine, but set no date for the sale. On July 12, 1989, Inman telephoned and asked Johnson if he could go to Johnson's house to buy one-half ounce of cocaine. When Inman arrived, they again discussed a future larger deal, and settled on a one-pound amount for $15,000. After Johnson's supplier arrived with the cocaine, Johnson consummated the sale of 12.1 grams of crack for $700.

On July 14, 1979, Inman again telephoned Johnson and discussed purchasing one pound of cocaine for $15,000. Inman requested all crack, but Johnson suggested an even split between crack and powder cocaine. Johnson explained that Inman could sell the drugs more easily if he also

* Honorable Joseph T. Sneed, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

had a supply of powder cocaine, because many people prefer it to crack. They arranged to meet the following day at 7:00 p.m. at the Antin House of Video Store to complete the deal. Inman arrived at the appointed hour and met Johnson who, after contacting his source, told Inman that he could get one pound of powder cocaine. Inman agreed to make the purchase, but broke off negotiations and left the scene after waiting nearly an hour for Johnson's source to arrive with the drugs. The police arrested Johnson on July 15, 1988, and the grand jury returned a two-count indictment three days later. The trial commenced on September 13, 1988, and the jury found the defendant guilty of both counts the following day.

During the government's opening statement at the trial, the defendant for the first time requested the identity of the informant. After the government objected and stated that the informant would not be called as a witness, the court refused to order disclosure. After the examination of each witness, the judge asked the jury if it had any questions for the witness. Individual jurors responded orally to the judge, who then submitted appropriate questions to the witness. Defendant did not object. One witness was asked a single question and the defendant was asked five, only one of which the judge prohibited.[1]

## II.  JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1291. The Notice of Appeal was timely filed under Fed.R.App.P. 4(b).

## III.  ANALYSIS

### A.  *Insufficiency of the evidence.*

■ Appellant contends that the evidence was insufficient to support his conviction, but he assigns no particular point of error to the lower court's judgment. This court can reverse only if "a reasonable jury could not have found guilt beyond a reasonable doubt." *United States v.*

*Meeks,* 857 F.2d 1201, 1204 (8th Cir.1988). Thus, the verdict must be sustained if supported by sufficient evidence. *United States v. Randle,* 815 F.2d 505, 508 (8th Cir.1987). At trial, appellant admitted to making two distributions of crack cocaine and negotiating for a third. The undercover officer testified that these transactions occurred. We conclude that a reasonable jury easily could return a guilty verdict on these facts.

### B.  *Improper Fed.R.Evid. 404(b) Evidence.*

■ At trial, the judge overruled appellant's objection to evidence pertaining to the attempted distribution on July 15, 1988, of one pound of cocaine three days after the second transaction. Appellant contends that the judge erred. Federal Rule of Evidence 404(b) permits admission of "other crimes" evidence "unless it tends to prove only the defendant's criminal disposition." *United States v. Kandiel,* 865 F.2d 967, 972 (8th Cir.1989). Because 404(b) is a rule of inclusion, rather than exclusion, this court will not disturb the trial court's discretion absent a showing by the defendant that the proof " 'clearly had no bearing upon any of the issues involved.' " *United States v. Galyen,* 798 F.2d 331, 332 (8th Cir.1986) (quoting *United States v. Estabrook,* 774 F.2d 284, 287 (8th Cir.1985)); *United States v. DeLuna,* 763 F.2d 897, 912–13 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). In this case, the evidence was relevant to the defendant's knowledge, intent, and predisposition to distribute cocaine base. We conclude that the lower court did not abuse its discretion. The admission of evidence regarding the attempted third transaction was sufficiently probative to outweigh any potential prejudice. *See also United States v. Burkett,* 821 F.2d 1306, 1309–10 (8th Cir.1987).

### C.  *Failure to Identify the Informant.*

■ As a third point of error, appellant alleges that disclosure of the govern-

---

1. The judge did not permit a question concerning recovery of the government's money as out-side the scope of the defendant's knowledge.

ment's confidential informant should have been ordered, even though he knew his identity. This contention is without merit. There is no absolute rule requiring disclosure, *McCray v. Illinois,* 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62, *reh'g denied,* 386 U.S. 1042, 87 S.Ct. 1474, 18 L.Ed.2d 616 (1967), and disclosure is not required where, as here, the defendant already knows the informant's identity. *United States v. Parker,* 836 F.2d 1080, 1083 (8th Cir.1987), *cert. denied,* 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988). The defendant has the burden to show that disclosure of the informant's identity would be material and helpful, *see id.,* a burden the appellant did not carry here. Accordingly, the trial judge properly exercised his discretion to withhold the disclosure of the informant's identity.

### D. *Refusal to Instruct on "Knowingly".*

■ Appellant next assigns as error the trial court's refusal to submit a jury instruction on the definition of "knowingly," and cites *United States v. Anderton,* 629 F.2d 1044, 1049 (5th Cir.1980), *appeal after remand,* 679 F.2d 1199 (1982). In *Anderton,* however, the court reversed and remanded for a new trial because the court failed to instruct the jury on the word "agent," a term the court noted "carr[ied] a rather esoteric meaning." *Id.* at 1049. This court has concluded that "knowledge" is "a word of common usage and thus within the ordinary understanding of a juror." *United States v. Smith,* 635 F.2d 716, 720 (8th Cir.1980). We have no trouble reaching the same conclusion for the word "knowingly." Defining this term would not aid the jury and might lead to unnecessary confusion. We thus affirm the lower court's refusal to instruct the jury on the meaning of "knowingly."

### E. *Refusal to Instruct on the Entrapment Defense.*

■ Next is the argument that the lower court erred by refusing to submit an entrapment instruction to the jury. Cited is a Fifth Circuit decision, *United States v. Timberlake,* 559 F.2d 1375 (5th Cir.1977).

In *Timberlake,* the court reversed because the trial court refused to charge the jury on entrapment after counsel had made it the fulcrum of the defense. In *Timberlake* it was observed: " 'Entrapment occurs only when criminal conduct is the product of the creative activity of government officials.' " 559 F.2d at 1378 (quoting *United States v. Groessel,* 440 F.2d 602, 605 (5th Cir.), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971)).

This circuit has determined that a lower court may refuse to submit an entrapment instruction when the defendant exhibited a disposition to engage in the criminal activity with which he was charged. *United States v. Irving,* 827 F.2d 390, 392 (8th Cir.1987). Appellant testified that he sold the crack to obtain money, thus evidencing a predisposition to commit the crime. Where the government merely provides an opportunity, the lower court may properly reject a requested entrapment instruction.

### F. *Juror Questioning of Witnesses.*

■ Appellant's sixth claim of error is that the trial judge incorrectly permitted jurors to ask questions of the witnesses. Counsel for appellant concedes the absence of any authority supporting his position. Nor did he lodge a timely objection at trial. The standard of review for an objection not raised at trial is plain error. Fed.R.Crim.P. 52(b); *United States v. Land,* 877 F.2d 17, 19 (8th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 243, 107 L.Ed.2d 194 (1989). Moreover, this court has found that permitting jurors to question witnesses is not itself plainly erroneous. *See Land, supra,* at 19 (following *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 516 (4th Cir.1985) (expressing reservations of juror questioning but finding no error) and *United States v. Polowichak,* 783 F.2d 410, 413 (4th Cir.1986) (same)). In light of this authority, we express no opinion on the appearance and propriety of juror questioning in general and conclude that the lower court did not plainly err in permitting such questions.

## G. Constitutionality of the Sentencing Act.

■ Finally, appellant asserts that his sentencing under the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., 28 U.S.C. § 991 et seq., should be reversed because that Act is unconstitutional. He fails to ground this allegation on any particular hardship to him as applied to or on any particular provision of the Constitution. Following Mistretta v. United States, — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), which upheld the constitutionality of the Act against a separation of powers attack, this court ruled that, on its face, the Act did not violate the due process clause. See United States v. Brittman, 872 F.2d 827, 828–29 (8th Cir.), cert. denied, — U.S. —, 110 S.Ct. 184, 107 L.Ed.2d 140 (1989) (rejecting facial challenge but noting that due process may prohibit certain applications of the Act). Absent a specific challenge, therefore, the district court's application of the Sentencing Act is affirmed.

AFFIRMED.

LAY, Chief Judge, with whom McMILLIAN, Circuit Judge, joins, concurring.

I write separately to express my concern about the trial judge's practice of allowing jurors to question witnesses from the jury box. In United States v. Land, 877 F.2d 17, 19 (8th Cir.), cert. denied, — U.S. —, 110 S.Ct. 243, 107 L.Ed.2d 194 (1989), this court called the practice "somewhat troubling," but held that questions from individual jurors did not represent such a blatant miscarriage of justice as to constitute plain error in the absence of a proper objection. I am not convinced. In my judgment allowing juror questions during trial is inherently prejudicial and should not be condoned.[1] In a criminal case the practice could reach constitutional dimensions, requiring reversal of a conviction under the due process clause.

### Questioning of the Defendant

In the present case although questioning was brief, juror interrogation of the defendant concerning his past use of drugs was clearly wrong.[2] The juror questions and answers were:

> JUROR # 12: I really have two questions that I was wondering if could be answered. How long was Mr. Johnson on the drugs and did he take drug treatment?
>
> THE COURT: Okay. The question is how long were you on drugs and did you take drug treatment?
>
> THE WITNESS: Well, I only started messing with cocaine and rock cocaine

---

1. Cf. Estes v. Texas, 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1632–33, 14 L.Ed.2d 543 (1965):

   [T]his Court itself has found instances in which a showing of actual prejudice is not a prerequisite to reversal. This is such a case. It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.

   Estes is a particularly appropriate analogy to the present case, because the prejudice in that case, as here, results from subtle psychological matters likely to exist but difficult to specifically identify. Estes held that the presence of television cameras in the courtroom was inherently prejudicial to the defendant's due process rights. The state had argued that "psychological considerations are for psychologists, not courts, because they are purely hypothetical." Id. at 541, 85 S.Ct. at 1632. The court responded,

   Television * * * by its very nature, reaches into a variety of areas in which it may cause prejudice to an accused. Still one cannot put his finger on its specific mischief and prove with particularity wherein he was prejudiced.

   * * * [E]xperience teaches that there are numerous situations in which it might cause actual unfairness—some so subtle as to defy detection by the accused or control by the judge.

   Id. at 544–45, 85 S.Ct. at 1633–34. This argument applies with equal force to the practice of juror questioning, a practice fraught with potential unfairness of a subtle and psychological nature that is difficult to identify with particularity.

   For other examples of inherent prejudice, see Rideau v. Louisiana, 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963) (televising defendant in the act of confessing inherently prejudicial); Penson v. Ohio, — U.S. —, 109 S.Ct. 346, 352–54, 102 L.Ed.2d 300 (1988) (appellate court's failure to appoint counsel after finding potentially meritorious claims of error in trial is presumed to result in prejudice).

2. The defendant had admitted his drug use and asserted a defense of entrapment. The trial judge undoubtedly felt the juror questions appropriate because the defendant had previously testified about his prior usage of drugs. This does not rectify, in my judgment, the appropri-

about eight months ago so I guess I stopped about three or four months after that and I was really trying to stop and I did go to one meeting, one AA meeting.

THE COURT: Anything else? All right.

JUROR # 12: Yes, I didn't understand if Mr. Johnson received any kind of money or drugs in exchange for his setting up these people. Was there any kind of money or drugs that he received for doing that, for setting up Detective Inman with Jerry?

THE COURT: All right. That's a good question.

THE WITNESS: No ma'am. They handed me the money, you know, and I got it for them and gave it to them, just like that. I was more or less, you know, kind of doing them a favor because I knew him and I really didn't want to do it from the beginning but I was more or less trying to do him a favor. I told him that.

JUROR # 1: They said the money was marked and the serial numbers were taken and if the money was passed from him to the other guy, was the money ever recovered and if they did, who had it?

THE COURT: Well, this witness wouldn't know that. You don't know that, do you?

THE WITNESS: No, sir.

JUROR # 7: I was curious why somebody would get involved in a drug deal like that and supposedly not get any monetary gain out of it, knowing that if they was apprehended what could happen.

THE COURT: Okay. Can you answer that?

THE WITNESS: Well, the first two times they got something, you know, he brought it over, you know, and like I say, he was a friend but Jerry had said, you know, maybe he would give me something if they got the pound but like I say, they don't always, you know, tell the truth, so I didn't know for sure on that.

THE COURT: Jerry said he would do what?

ateness of the juror questions to further interro-

THE WITNESS: He said maybe he would give me something, you know, if they go the pound, if that went through.

THE COURT: All right.

JUROR # 12: When he says "some" does he mean drugs or does he mean money?

THE COURT: Yeah. Do you mean that he would give you some drugs or some money?

THE WITNESS: Money, Your Honor.

The prosecutor could not have asked the defendant questions about his past drug use. *See* Fed.R.Evid. 404(a)(1) and 404(b) (evidence of character, or of other crimes or wrongs, not admissible to prove person acted in conformity therewith). If the defendant had refused to answer, as was his right, or if counsel had objected, the prejudicial effect on the jury could have been more devastating than were the defendant's answers. A jury frustrated in its pursuit of "truth" might well speculate on the defendant's probable answer, perhaps inferring more from the failure to answer than it would have gleaned from the answer itself. While such a risk always arises when a question goes unanswered, the risk is exacerbated when the question is the jury's own. *See DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 517 (4th Cir.1985) (over the course of a trial, jury develops a sense of cohesiveness and camaraderie, placing more importance on the reactions and questions of each other than on questions and answers presented in the normal adversarial process).

Theoretically, the court could instruct the jury not to place any weight on an improper question. Such measures, however, would likely be ineffective. As the *DeBenedetto* court explained:

Although the court can take remedial steps once such an improper or prejudicial question is asked * * * the remedial steps may well make the questioning juror feel abashed and uncomfortable, and perhaps even angry if he feels his pursuit of truth has been thwarted by rules he does not understand.

*Id.* at 516.

While refusing to answer or objecting to a question presents perils for the defense, gate the defendant about his drug use.

so too does answering the question. Because lay jurors will not understand the rules of evidence, they may well ask impermissible questions, such as those directed at the defendant's character. Because the jury will place great weight on answers to their own questions, they easily could end up convicting on an impermissible basis. The government candidly admitted at oral argument that the practice of admitting jury questions can work to the detriment of either party. Counsel stated, "it is like playing Russian roulette—you never know what will happen."

I am well aware of studies, reflecting the views of some social scientists and perhaps some judges and lawyers, that suggest the practice of juror questioning is worth further experimentation in the courts. *See, e.g.,* Heuer and Penrod, *Increasing Jurors' Participation in Trials: A Field Experiment with Jury Notetaking and Question Asking,* 12 Law & Human Behavior 231 (1988). Nevertheless, the wise caution of the *DeBenedetto* court should control:

> [J]uror questioning is a course fraught with peril for the trial court. No bright-line rule is adopted here, but the dangers in the practice are very considerable.

*DeBenedetto,* 754 F.2d at 517.

### Distortion of the Jury's Role

Some would respond to the concerns about juror questions by suggesting that the court could require the questions to be submitted in writing, and the court could then hear and rule on objections outside of the jury's presence. Apart from concerns

about the disruption this procedure might cause, the practice of juror questioning raises an even more basic problem than matters of procedure: *The fundamental problem with juror questions lies in the gross distortion of the adversary system and the misconception of the role of the jury as a neutral factfinder in the adversary process.* Those who doubt the value of the adversary system or who question its continuance will not object to distortion of the jury's role. [3] However, as long as we adhere to an adversary system of justice, the neutrality and objectivity of the juror must be sacrosanct.

Allowing juror questions disrupts neutrality, because even a seemingly innocuous response to a seemingly innocuous juror question can sway the jury's appraisal of the credibility of the witness, the party, and the case. The factfinder who openly engages in rebuttal or cross-examination, even by means of a neutral question, joins sides prematurely and potentially closes off its receptiveness to further suggestions of a different outcome for the case. While nothing can assure the jury will remain open-minded to the end, keeping the jury out of the advocacy process increases the probability. [4]

The neutrality of the jury is crucial to reaching the truth in an adversary trial. Truth in the adversarial process emerges from the presentation of competing points of view about the events in question. The jury's role, in essence, is to select the more plausible theory of the case or "story." [5]

3. For particularly scathing attacks on the adversary system, *see* M. Frankel, *Partisan Justice* (1980); Frankel, *The Search for Truth: An Umpireal View,* 123 U.Penn.L.Rev. 1031 (1975). *See also,* Luban, *The Adversary System Excuse,* in *The Good Lawyer* 83 (D.Luban ed. 1983).

4. Although no empirical studies address the effect of juror questions on neutrality, several commentators mention it. *See, e.g.,* S. Landsman, *The Adversary System: A Description and Defense* 3 (1984). One empirical study tests many aspects of juror questions, but with respect to the risk that juror questions affect their neutrality, the authors write, "[b]ecause of the difficulty of measuring this possible consequence of juror questions, we were unable to test this hypothesis." Heuer and Penrod, *In-*

*creasing Jurors' Participation in Trials: A Field Experiment with Jury Notetaking and Question Asking,* 12 Law & Human Behavior 231, 255 (1988). One exhaustive review of empirical studies on jury deliberations concludes that, in their present role as neutral factfinder, jurors proceed through fact-finding in a careful, methodical manner, and they weigh evidence carefully. V. Hans and N. Vidmar, *Judging the Jury* 97–112 (1986).

5. *See* Goodpaster, *On the Theory of American Adversary Criminal Trial,* 78 J.Crim.L. & Criminology 118, 132–33 (1987):

> When there is uncertainty about what happened, the uncertainty must be settled through meaningful constructions of the data or evidence presented. The data, in turn, is

A lawyer's success in presenting a convincing story often depends on his ability to question the obvious, in order to demonstrate the truth of initially unlikely facts. Every effort must be made to ensure that the jury will not close its mind to these unlikely possibilities before counsel has had the opportunity to fully develop and present them.

Some may urge that this argument is a justification of lawyers' attempts to manipulate and distort the truth. This criticism, however, presumes that witnesses always tell the truth and never make mistakes. Human nature suggests the contrary. Jerome Frank pointed out the "fact skepticism" inherent in the courtroom re-creation of past events.[6] His observation, acknowledged by every experienced trial counsel, was that even unbiased witnesses who attempt to testify honestly have a limited ability to recall everything they heard and saw, and they necessarily place their own interpretation on their observations. Even greater distortion occurs when a witness has a bias in favor of a given outcome in the case.[7] In addition, the jury's evaluation of the witnesses' testimony adds another layer of interpretation further distorting the "truth." The "line-up" cases[8] illustrate the principle of fact skepticism and the need for the adversary process to cast doubt on what initially appears to be the obvious truth. Those cases show that

a good faith identification of a suspect in a line-up is often incorrect due to the suggestive circumstances surrounding presentation of the suspect to the witness.[9]

Counsel's job is to use his knowledge of the case's details and his skills of cross-examination to draw out for the jury potential misperceptions in the witnesses' testimony and weaknesses in the other side's story. To allow the factfinder to join in this exploration encourages it to prematurely adopt the interpretation of one side or the other. In the process of interrogation the jury loses the open-mindedness the process requires them to retain until all the evidence is in and the court's instructions are given. To reach the truth requires skillful advocacy before a neutral factfinder willing to listen to the argument. If the juror begins to match his interrogation skills with the lawyer all of that is lost.

The fundamental worth of the adversary system turns on the proper role of the litigant, witness, judge, lawyer and jury. The factfinder must remain neutral until it is time to make its findings. There exists too much danger in distortion of the jurors' role when an individual juror can, under the guise of neutrality, become an advocate in the process.

The neutrality of the jury promotes not only truth, but also justice in a broader sense. Our system of justice must provide

---

generated by theories or stories proposed to explain all of the data, including the credibility of those who presented it. * * * A decision about what the "facts" are is an implicit acceptance of the theory or story which gives the data credible meaning by connecting it into a unified whole.

A trial is, therefore, a contest over the meaning of evidence, and the "evidence" is data that the trial attorneys have already shaped into some frame of reference. * * * The trier of fact uses all of the trial data, including the respective attorneys' shaping and reading of the evidence, to draw its own inferences and to generate its own reading of the evidence. * * *.

"Truth," in the context of an adversary trial, is thus, the inferences of ultimate historical fact and liability that the fact-finder draws from the "evidence" that the adversaries help to fashion. How closely such "truth" comports with the "real truth," whatever that might be, is indeterminable.

6. J. Frank, *Courts on Trial: Myth and Reality in American Justice* (1950).

7. Frank opposed the adversary system as a truth finding process. I respectfully disagree. My own view is that quite often the adversary system forces disclosure of facts that would otherwise go unmentioned. *See* Lay, *Abandon the Adversary System?—Humbug!* 11 Int'l Soc'y Barristers Q. 178, 184–87 (1976). But this is not the time or place to debate abandoning the adversary process.

8. *See e.g., United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Gilbert*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

9. *Wade*, 388 U.S. at 228–35, 87 S.Ct. at 1932–37 (explaining in detail the possibilities for suggestion).

every opportunity to protect against the incarceration of an innocent person, even where innocence initially seems unlikely.[10] The neutral jury provides the accused the chance to present his interpretation of events to a decisionmaker open to suggestions of reasonable doubt. As the Supreme Court has observed:

> The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action [of government]. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it.

*Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968).

When the jury becomes an advocate or inquisitor in the process, it forsakes its role of arbiter between the government and its citizens. The record in the present case shows that, of the several witnesses who testified, the jurors directed all but one of their questions to the defendant. They asked him why he had arranged the drug sales, whether he had gone to drug treatment, and whether he received money for brokering the transactions. These questions underscore the possibility that if given the chance to aggressively interrogate a defendant, the jury may turn to demanding that the defendant justify himself, rather than waiting for the government to justify its prosecution of him.

Jury interrogation of defendants not only impairs the attainment of just results; it demeans the very appearance of justice. As Justice Frankfurter said about a judge who appeared to take sides in a trial, "[t]hese are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, justice must satisfy the

appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). Because juror questions give the impression that the defendant faces a tribunal biased against him, the moral authority of the court and trial suffers.

Juror interrogation, in either a civil or criminal case, is fraught with danger and borders on a finding of prejudice per se. I express a hope it will cease at least in this circuit. However, I must at this time concur in the affirmance of the conviction because I am bound by our precedent in *United States v. Land,* which holds that in the absence of a contemporaneous objection, juror's questions do not constitute plain error.

---

**10.** *See* Goodpaster, 78 J.Crim.L. & Criminology at 125–27 (jury system protects individuals against over-reaching government).