UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Mohammad AJMAL, Defendant–
Appellant–Cross–Appellee,

Muhammad Afzal and Hassan Sabghat
Ullahkhan, Defendants.

Nos. 1782, 2093, Dockets 94–1627, 94–1649.

United States Court of Appeals,
Second Circuit.

Argued June 22, 1995.

Decided Sept. 20, 1995.

Darrell B. Fields, The Legal Aid Society Federal Defender Division, Appeals Bureau, New York City, for defendant-appellant-cross-appellee.

Paul D. Silver, Assistant United States Attorney, Northern District of New York, Albany, New York (Thomas J. Maroney, United States Attorney, on the brief), for appellee-cross-appellant.

Before: KEARSE, ALTIMARI, and PARKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant-cross-appellee Mohammad Ajmal ("Ajmal") appeals from a judgment entered in the United States District Court for the Northern District of New York (Scullin, J.), convicting him, following a jury trial, of possession of heroin with intent to distribute and sentencing him principally to 84 months' imprisonment. At trial the district court allowed extensive juror questioning of witnesses, which Ajmal asserts was an abuse of discretion meriting a new trial. Moreover, Ajmal argues that the district court erred in allowing the government's principal witness to testify on direct examination almost entirely through leading questions. The government cross-appeals, asserting that the district court miscalculated Ajmal's sentence. Because we agree that the district court abused its discretion in encouraging juror questioning, we vacate and remand for a new trial. We further conclude that the district court properly exercised its discretion in allowing leading questions of a non-English speaking witness on direct examination. Finally, we address the district court's sentencing determinations.

## BACKGROUND

On July 23, 1993, Mohammad Ajmal and two alleged co-conspirators, Muhammad Afzal ("Afzal") and Hassan Ullahkhan ("Ullahkhan"), were indicted for possessing with intent to distribute heroin, 21 U.S.C. § 841, and conspiring to distribute and to possess with intent to distribute approximately one kilogram of heroin, 21 U.S.C. § 846. In exchange for a lesser sentence, Afzal pled guilty and assisted the government in its prosecution of Ajmal and Ullahkhan. An initial trial of the remaining co-defendants ended in an acquittal of Ullahkhan and a hung jury as to Ajmal. On May 10, 1994, a second trial of Ajmal commenced.

At the outset of the trial, in his general instructions to the jury, Judge Scullin stated:

Also I will allow questions. You'll have to submit your questions in writing to the court before a witness leaves the stand. I will ask you if anybody has any questions of this witness. If you do, just raise your hand and write the question down, give it to the clerk and I'll review it, and unless there is some problem with asking the question, I'll normally ask it. Sometimes you may ask a question that you can't ask, but I'll let you know that as well.

Just as the district court had instructed, as each witness's testimony concluded the court would ask the jury members if they had any questions. After screening the proposed questions for evidentiary problems, the district court would then ask the witness on the stand those questions which it deemed permissible. The jury took extensive advantage of the opportunity to ask questions of the witnesses, including questioning Ajmal himself. Despite the objection of Ajmal's attorney, the district court allowed the jurors to continue questioning witnesses throughout the trial as a matter of course. On May 24, 1994, after a day of deliberation, the jury convicted Ajmal of possession of heroin with intent to distribute, but acquitted him of the conspiracy charge. On October 27, 1994, Ajmal was sentenced principally to 84 months' imprisonment.

Ajmal now appeals. The government cross-appeals the district court's sentencing determination.

## DISCUSSION

### 1. Juror Questioning of Witnesses

At trial, over the objection of Ajmal's attorney, the district court allowed extensive juror questioning of witnesses. While conceding that the decision to allow or disallow juror questioning of witnesses lies within the district court's discretion, *see United States v. Witt*, 215 F.2d 580, 584 (2d Cir.), *cert. denied*, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954), Ajmal asserts that the district court abused its discretion by allowing such questioning as a matter of course. We agree.

■ As we recently noted in *United States v. Bush*, 47 F.3d 511, 515 (2d Cir.1995), the practice of allowing juror questioning of witnesses is well entrenched in the common law and in American jurisprudence. Indeed, the courts of appeals have uniformly concluded that juror questioning is a permissible practice, the allowance of which is within a judge's discretion. *See, e.g., id.; United States v. Stierwalt*, 16 F.3d 282, 286 (8th Cir.1994); *United States v. Cassiere*, 4 F.3d 1006, 1017–18 (1st Cir.1993); *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986).

Nonetheless, the courts of appeals are similarly unified in their disapproval of the general practice of juror questioning of witnesses. As we stated in *Bush*, "[a]lthough we reaffirm our earlier holding in *Witt* that juror questioning of witnesses lies within the trial judge's discretion, *we strongly discourage its use*." 47 F.3d at 515 (emphasis added); *accord Cassiere*, 4 F.3d at 1018 ("the practice should be reserved for exceptional situations, and should not become routine, even in complex cases"); *United States v. Sutton*, 970 F.2d 1001, 1005 (1st Cir.1992) ("Allowing jurors to pose questions during a criminal trial is a procedure fraught with perils. In most cases, the game will not be worth the candle."); *United States v. Lewin*, 900 F.2d 145, 147 (8th Cir.1990) ("[the court] does not condone the practice of inviting juror questions"); *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 516 (4th Cir.1985) ("the practice of juror questioning is fraught with dangers which can undermine the orderly progress of the trial"). It is clear from our exhortation in *Bush* that district courts may not exercise their discretion without regard to the balance of potential benefits and disadvantages of juror questioning of witnesses.

In our recent discussion of juror questioning of witnesses, we made clear the danger inherent in such a practice. *See Bush*, 47 F.3d at 515–16. When acting as inquisitors, jurors can find themselves removed from their appropriate role as neutral fact-finders. *See id.* at 515; *United States v. Johnson*, 892 F.2d 707, 713 (8th Cir.1989) (Lay, *C.J.*, concurring). If allowed to formulate questions throughout the trial, jurors may prematurely evaluate the evidence and adopt a particular position as to the weight of that evidence before considering all the facts. *See id.* at 714 ("The factfinder must remain neutral until it is time to make its findings."); *DeBenedetto*, 754 F.2d at 517. "The practice also delays the pace of trial, creates a certain awkwardness for lawyers wishing to object to juror-inspired questions, and runs a risk of undermining litigation strategies." *Sutton*, 970 F.2d at 1005; *see also Bush*, 47 F.3d at 515. Moreover, juror questioning is particularly troublesome when it is directed at the defendant himself in a criminal trial. *See Sutton*, 970 F.2d at 1006 n. 6; *Lewin*, 900 F.2d at 147. In such circumstances, premature deliberation and expressed skepticism by jurors can be highly prejudicial.

■ The case at hand does not present sufficiently "extraordinary or compelling circumstances" as to justify juror questioning of witnesses. *Bush*, 47 F.3d at 516 ("Balancing the risk that a juror's question may be prejudicial against the benefit of issue-clarification will almost always lead trial courts to disallow juror questioning, in the absence of extraordinary or compelling circumstances."). The district court's decision to invite juror questioning was not necessitated by the factual intricacies of this banal drug conspiracy, nor was it prompted by the urging of the jurors themselves. Rather, the district

court, as a matter of course, established at the outset of the trial that jurors would be allowed to question witnesses. Indeed, the district court encouraged juror questioning throughout the trial by asking the jurors at the end of each witness's testimony if they had any queries to pose. Not surprisingly, the jurors took extensive advantage of this opportunity to question witnesses, including Ajmal himself. Such questioning tainted the trial process by promoting premature deliberation, allowing jurors to express positions through non-fact-clarifying questions, and altering the role of the jury from neutral fact-finder to inquisitor and advocate. Accordingly, the district court's solicitation of juror questioning absent a showing of extraordinary circumstances was an abuse of discretion.

■ The government urges us to sustain the district court's actions because it incorporated prophylactic procedures to lessen the potential prejudice caused by juror questioning of witnesses. Specifically, the district court only accepted questions in writing and posed from the bench only those questions which it viewed to comport with the Federal Rules of Evidence. Although the district court substantially complied with the procedures this Court advocated in *Bush*, 47 F.3d at 516 (juror questions should be 1) in writing; 2) reviewed by counsel in camera; and 3) put to the witness by the court), such measures alone cannot purge the harm caused by the extensive juror questioning in the case at hand. Regardless of the procedures adopted by the district court to vet juror questions, there must be ample justification for adopting the disfavored practice in the first instance. To hold otherwise would sanction juror questioning of witnesses in any circumstance, so long as appropriate prophylactic measures are adopted. We cannot accept such a proposition.

In light of the discussion above, the district court's encouragement of juror questioning of witnesses in the case at hand was an abuse of discretion. Accordingly, we vacate and remand for a new trial. While we vacate the proceeding below, we next address Ajmal's and the government's remaining contentions to give the district court guidance on retrial and in the event of resentencing.

## 2. Leading Questions

The primary witness against Ajmal at trial was Afzal, his former alleged co-conspirator turned government witness. Afzal, a Pakistani national, spoke little English and testified primarily in Urdu through a translator. After soliciting preliminary matters from Afzal, the government stated, "[y]our honor, I get the sense that some of the jurors can't hear. I just ask if they don't understand, if they can give you some indication." To this the district court replied:

> I think it might be better, if you would, to lead the witness because of the difficulty in translating here from Urdu to English and English to Urdu, if you were to lead the witness, it would be okay. Normally I would not allow an attorney to lead the witness, but I think in this circumstance it would be more appropriate.

Accordingly, the vast majority of Afzal's remaining testimony amounted to his affirming or rejecting statements made by the government (e.g., "Q: Mr. Afzal, did Malik ask you if you could provide him with heroin? A: Yes.").

Ajmal argues that allowing his principal accuser to testify virtually entirely by way of leading questions violated his Sixth Amendment right to confrontation and denied him a fair trial. In support of his Confrontation Clause claim, Ajmal cites *Maryland v. Craig*, 497 U.S. 836, 846, 110 S.Ct. 3157, 3163–64, 111 L.Ed.2d 666 (1990), in which the Supreme Court stated that the right to confrontation allows "the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." (quoting *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970)). Because Afzal did nothing more than confirm or reject statements made by the prosecutor, Ajmal argues that the jury could not possibly assess Afzal's credibility; thus, Ajmal insists his confrontation rights were violated.

■ We reject Ajmal's constitutional challenge. As the Supreme Court noted in *Craig*, the purpose of the Confrontation Clause—to subject evidence presented against the accused to the rigors of the adversarial process—is served by "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." *Id.* All of the safeguards chronicled in *Craig* existed in Afzal's testimony—Afzal was present, testified under oath, sat before the jury so that it could assess his demeanor, and most importantly was subjected to cross examination. While the jury may have gained greater insight into Afzal's demeanor had he testified in his own words, the Constitution did not require it.

■ Ajmal also asserts that the government's excessive leading questions contravened Fed.R.Evid. 611(c), which states: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." While Ajmal acknowledges that leading questions on direct examination are acceptable when "the witness ... does not appreciate the tenor of the desired details and thus is unable to say anything about it," 3 *Wigmore on Evidence*, § 778 (1970 ed.), he suggests that such an exception does not apply to a foreigner testifying via a translator. Despite the district court's determination that leading questions were acceptable because of the difficulty in translating from English to Urdu and back again, Ajmal argues that any language difficulties which may have justified such a measure were cured by the use of a translator. According to Ajmal, for evidentiary purposes, individuals testifying by way of a qualified translator are indistinguishable from witnesses testifying in their native tongues.

Despite Ajmal's assertion, the district court's allowance of leading questions in the present case was not a clear abuse of discretion. *See United States v. DeFiore*, 720 F.2d 757, 764 (2d Cir.1983), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). As this Court stated with regard to a predecessor version of Rule 611(c), the rule employs "words of suggestion, not command.

In addition, as indicated in the Advisory Committee's Note to this rule, '[a]n almost total unwillingness to reverse for infractions has been manifested by appellate courts.'" *DeFiore*, 720 F.2d at 764. Faced with a similar situation in which leading questions were asked of a non-English speaking witness testifying through a translator, the Tenth Circuit determined that the allowance of leading questions in such a "language situation" was a permissible exercise of the district court's discretion. *See United States v. Rodriguez–Garcia*, 983 F.2d 1563, 1570 (10th Cir.1993). We reach a similar conclusion.

While in many instances testimony given by way of translator may be indistinguishable from testimony given in one's native tongue, this is not always the case. Translations necessarily reflect the interpretations and understanding of the translator. Given this notable distinction between translated testimony and testimony given in one's native tongue, and given the "almost total unwillingness" of the courts of appeals to reverse for 611(c) infractions, we cannot say that the district court abused its discretion by allowing leading questions on direct examination of Afzal.

### 3. Sentencing Determinations

Prior to sentencing, the district court considered three issues: 1) the proper amount of drugs attributable to Ajmal; 2) the appropriateness of an enhancement for obstruction of justice; and 3) the appropriateness of a reduction in Ajmal's base offense level for his "minor role" in the offense. With respect to these issues, the district court found that:

> the amount of drugs actually in possession of the Defendant [and attributable to the Defendant] are less than one kilogram.... The Court also finds that there was not sufficient basis for enhancing the level to two more levels based upon the obstruction. I find that the Defendant's role in this criminal conduct [was] minor in relation to the other defendants.

The government cross appeals the district court's determination regarding the amount of drugs attributable to Ajmal and the determination that Ajmal played a "minor" role in the crime.

### A. Amount of Drugs Attributable

At a hearing prior to sentencing, the government urged the district court to attribute a full kilogram of narcotics to Ajmal. While Ajmal only possessed 987 grams of heroin at the time of his arrest, the government argued that because Ajmal had intended to possess and distribute a full kilogram of heroin the district court should have attributed to him the entire amount he contemplated. The district court rejected the government's argument without elaboration, and held Ajmal responsible for only the 987 grams of heroin he actually possessed.

Relying on *United States v. Tejada*, 956 F.2d 1256 (2d Cir.), *cert. denied*, —— U.S. ——, ——, 113 S.Ct. 124, 334, 121 L.Ed.2d 80, 252 (1992), the government argues that the district court erred by failing to attribute to Ajmal the entire kilogram of heroin that he and his alleged co-conspirators had contemplated distributing. As this Court held in *Tejada*, "in a drug transaction the offense level of a defendant attempting to purchase narcotics is properly calculated according to the amount negotiated, not the lesser amount actually delivered." *Id.* at 1264. In reaching such a result, we relied on Application Note 1 to § 2D1.4 of the Sentencing Guidelines (1991 ed.), which stated "[i]f the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." Accordingly, in *Tejada* this Court held that the district court was required to attribute the full two kilograms of cocaine negotiated by the defendant despite his having received only 1.989 kilograms. The government urges a similar result in the case at hand.

Ajmal, however, argues that our more recent opinion, *United States v. Podlog*, 35 F.3d 699 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995), makes clear that Application Note 12 to § 2D1.1 (formerly Note 1 to § 2D1.4) does not apply to the case at hand. The language of the Application Note, according to Ajmal, unambiguously states that it only applies to amounts "under negotiation" in "uncompleted distribution[s]." While Ajmal may have originally negotiated for one kilogram of heroin, he argues that the district court properly attributed only the 987 grams of heroin that he actually possessed as the result of the completed distribution. Accordingly, Ajmal contends that *Tejada* only applies to those circumstances in which the amount of narcotics to be distributed remains under negotiation at the time of arrest; once the distribution is complete, the court is required to attribute the amount actually obtained.

Ajmal's urged reading of *Tejada* and *Podlog* is incorrect. In *Podlog*, the defendant initially expressed interest in receiving either 125 or 400 grams of heroin. Ultimately the defendant determined that he only needed 125 grams and agreed to purchase that amount from his supplier. Accordingly, we held that it was improper to attribute the 400 grams to him when the agreed upon purchase was for a significantly smaller amount. As the Court pointed out:

> In cases in which the narcotics distribution was completed, we have held that, notwithstanding varying amounts involved in the negotiations leading up to the final conspiratorial agreement, it is the amount ultimately agreed upon that should be punished.

*Podlog*, 35 F.3d at 708 (emphasis added). Similarly, we made clear in *Tejada* that district courts should calculate a defendant's sentence in light of the amount of narcotics agreed upon and not the smaller amount actually received. 956 F.2d at 1264. Thus, had the defendant in *Podlog* agreed to purchase 125 grams of heroin but only received 120 grams, the district court would have been required to attribute the full 125 grams of heroin to him when making its sentencing determination.

■ Given the discussion above, the specter is raised as to the possibility that the district court misconstrued the law when sentencing Ajmal. The district court's reasoning behind attributing only the 987 grams of heroin to Ajmal is difficult to ascertain in light of the spartan record. While the jury below acquitted Ajmal of the conspiracy charge, the district court was entitled to make its sentencing determination based upon his conspiratorial acts so long as it

determined by a preponderance of the evidence that those conspiratorial acts took place. *See United States v. Eng*, 14 F.3d 165, 170 n. 2 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994). If, in fact, the district court determined at sentencing that Ajmal had entered into a conspiracy to distribute one kilogram of heroin, the district court improperly failed to attribute to Ajmal the entire kilogram of narcotics agreed upon by the conspirators. If, however, the district court determined by a preponderance of the evidence that Ajmal had not engaged in a conspiracy to distribute a full kilogram of heroin, then it properly attributed only the 987 grams of heroin he actually possessed on arrest. In the event that Ajmal is convicted on retrial, the district court must specify the basis of its drug quantity determination.

### B. Minor Role

 At sentencing the district court reduced Ajmal's base offense level by two levels for his minor role in the offense. *See* U.S.S.G. § 3B1.2, comment. (n. 3) (two level reduction appropriate where "participant [ ] is less culpable than most other participants, but whose role could not be described as minimal"). The district court's comments at sentencing indicate that it misapprehended the proper circumstances in which such a reduction is warranted. The district court initially stated that Ajmal's conduct was "minor in relation to the other defendants." Moreover, in discussing its determination, the district court noted that Ajmal was a "[m]inor participant *vis-a-vis the role of his co-conspirators*." (emphasis added). To the extent that the district court based its determination *solely* upon the relative culpability of Ajmal and his co-conspirators, it misconstrued the law.

This Court has made clear that "the Sentencing Commission·intends for culpability to be gauged relative to the elements of the offense of conviction, not simply relative to co-perpetrators." *United States v. Pena*, 33 F.3d 2, 3 (2d Cir.1994); *see also United States v. Lopez*, 937 F.2d 716, 728 (2d Cir. 1991) (reduction appropriate where defendant is "substantially less culpable than the *average* participant") (quoting U.S.S.G. § 3B1.2, comment. (backg'd.) (emphasis in *Lopez* )); *United States v. Caruth*, 930 F.2d 811, 815 (10th Cir.1991) ("the Guidelines permit courts not only to compare a defendant's conduct with that of others in the same enterprise, but also with the conduct of an average participant in that type of crime"). The fact that Ajmal played a minor role in his offense "vis-a-vis the role of his co-conspirators" is insufficient, in and of itself, to justify a two level reduction; Ajmal must have similarly played a minor role in comparison to the average participant in such a drug crime. In the event that the district court resentences Ajmal, it should be mindful of the mandates of *Pena*.

### CONCLUSION

For the foregoing reasons, we vacate Ajmal's conviction and remand for retrial.