STATE v. C. D. CRAWFORD and Another.[1]

October 27, 1905.

Nos. 14,494—(27).

**Appeal—Questions by Juryman.**

Where questions improper in form are asked of and answered by a wit-
ness in a criminal case, and no objection is made nor exception taken, no
error is saved which is subject to review by an appellate court as a mat-
ter of right; and if such inquiries are made by a juryman with the court's
permission, failure of the court to interpose objections is not necessarily
reversible error.

**New Trial.**

In criminal cases, the granting or refusing of a new trial for errors of
law should not be determined by mere technical conformity with or in-
fringement of rules of practice and evidence.

**Same.**

New trials should be granted only when the substantial rights of the
accused have been so violated as to make it reasonably clear that a fair
trial was not had.  State v. Nelson, 91 Minn. 143, followed and applied.

**Homicide—New Trial.**

The defendant in this case was found guilty of murder in the first
degree and was sentenced to be hanged for the murder of a fellow travel-
er in a box car, while the accused and another were engaged in holding up
the murdered man and other inmates of that car.  The principal assign-
ment of error was based upon questions asked by a juror of a witness, with
the court's permission, involving a conclusion or opinion as to whether the

[1] Reported in 104 N. W. 822, 768.

accused stepped aside to take aim at his victim, to which no objection was made and no exception was taken. Four eyewitnesses to the shooting testified, without attack, impeachment, or inconsistency, to every detail of the homicide. The revolver which fired the bullet and the bullet which was taken from the brain of the dead man were produced, identified, and connected with the accused. He himself took the stand in his own defense and admitted the robbery and shooting, but denied intent to kill. Under such circumstances, a new trial is refused and the judgment affirmed.

Appeal by defendant C. D. Crawford from a judgment of the district court for Sherburne County, Giddings, J., whereby he was convicted of the crime of murder in the first degree and sentenced to be hanged. Affirmed.

*Ernest S. Cary* and *Charles S. Wheaton,* for appellant.

*Edward T. Young,* Attorney General, *C. S. Jelley,* Assistant Attorney General, and *Frank T. White,* County Attorney, for the State.

JAGGARD, J.

The accused, C. D. Crawford, jointly indicted with one George R. Palmer for murder in the first degree, was convicted on separate trial and was sentenced to be hanged. On application of his counsel, a stay of execution was granted.[2] The case comes before this court upon an appeal from the judgment of the trial court.

The assignments of error are twenty-three in number. Upon argument in this court, counsel for the accused expressly waived all except the one to which reference will especially be made hereafter. A brief statement of the facts in this case is essential to the proper understanding of the questions thus raised.

[2] The stay was filed August 30, 1905, and was as follows:
START, C. J.

A motion on behalf of the appellant to stay the execution of the judgment herein until his appeal can be presented to, heard, and determined by the supreme court having been duly made, heard, and considered, it is ordered that the motion be granted, and that the execution of the judgment in this case be, and it is hereby, stayed until the appeal from the judgment can be and is heard and determined, or the court otherwise directs. Ordered, further, that a certified copy of this order be delivered to the sheriff of the county of Sherburne, to whom a warrant for the execution of the judgment has been delivered.

Crawford and his codefendant, Palmer, knew each other before the night of the murder. Crawford had been in the army and was familiar with the handling of firearms. He and Palmer, together with five other young men, Lundin, Freeman, Bjorquist, Conradson, and Kenner, were riding together on a freight train, in a combination mail and baggage car, with the consent of a brakeman. Crawford, testifying on his own behalf, confirms the narrative of the other eyewitnesses in almost all essential particulars.

In substantially his own language, the tragedy occurred as follows: He had said to Palmer, while they were on the car: "Let's hold them up." Palmer replied: "All right; I've a flash light." He passed the light over to Crawford, who then had both the light and a revolver. Palmer found a club in the car. "They each knew what each of them had to do, and what he had to do in order to make this hold-up effective." Crawford held the flash light in his left hand on the heads and faces of the men, "on one and then the other," and followed the light with his revolver in his right hand. Palmer flourished his club. Both Crawford and Palmer cried out: "Throw up your hands!" Although no one offered any resistance, Crawford fired one shot in the air just to "scare" the prospective victims. At the rear end of the car was a sorting table, about five feet long and four feet wide. Lundin and Bjorquist had lain down on it and had gone to sleep, each lying on his right side, each with his face to the front end of the car. Bjorquist awoke, got off the table, and held up his hands. Lundin remained on the table. After the first shot was fired, Lundin, lying with one hand in his overcoat pocket, did not get up; but, when Palmer tried to waken him, it seemed to Crawford "as if he kind of raised up a little." Palmer then stepped away and, according to Crawford, said to Crawford, "Wake him up;" according to all other eyewitnesses, "Shoot the son of a bitch." Crawford, then only a few feet away from Lundin, passed the light backward and forward and followed the light with the revolver. He "shot the revolver immediately after Palmer said 'Wake him up.'" He said: "I was standing more or less standing still at that time, but just then the cars, just as he said 'Wake him up,' the cars jerked. I had the revolver like this [illustrating], and just as he said 'Wake him up' the train jerked and I stepped forward. It threw me forward and brought the revolver down like that [illustrating]

96 M.—7

just as the cars jerked, and just as I went forward the gun went off, and I noticed that the man on the table kind of quivered. I noticed that he did not get up."

The witnesses indicated the way in which Crawford held the flash light in his left hand, so that the light fell on Lundin's face, and the gun in his right hand. He raised or moved up his arm when he was getting ready to shoot Lundin. Conradson testified, without objection, that Crawford "moved it [the flash light] up like this and took aim. He did not take a very long aim, but he brought it up to his eye." Without objection, Kenner testified at one place "that Crawford just took deliberate aim and fired." At another place, in answer to the question: "Did you mark that as the place where he was standing at the time the first shot was fired?" He said, "No, sir; I don't think so, and, if I did, I was mistaken, because he stepped over there at the time he fired the second shot, so that he would have a chance to get a line on his [Lundin's] face."

The two defendants then proceeded to rob their four living companions. When they came to the dead man, Palmer seems to have hesitated; but Crawford said: "You need not be afraid of him. He is dead. Dead men tell no tales." Thereupon Palmer robbed the body, taking from it, among other things, a watch. Having taken everything they could find, Palmer said: "We are having damned poor luck this fall," or "damned poor picking this fall." Crawford thereafter ordered Conradson to open the car door, and Palmer said: "We are through with you fellows. Climb out of there." The men in the car proceeded to obey. One of them got out of the car just as the rapidly moving train was about to go over a bridge. He waited until the bridge was passed and then jumped. The others followed. None were seriously hurt. The two defendants stayed on the train some time longer, then left it and went to the shores of the river where they divided the "swag" or "junk" as Crawford describes it. This included the watch which was taken from the body of the dead man and identified by his father, the jeweler who sold it, and otherwise, and which was found in Crawford's possession when he was arrested.

Toward the close of the case of the state there occurred the only matter which is now properly before us upon assignment of error. The record reads:

By One of the Jurors: Q. I would like the witness a question to ask. The Court: You may ask it. Q. Mr. Conradson, you say that after he the first shot did fire, and before he did the second shot fire, he did to one side step? A. Yes, sir. Q. Now I would like to ask you if your best judgment is if he, after he the first shot did fire, and before he did the second shot fire, he did to one side step that he might the better aim take? A. Yes, sir; so that he could see Lundin's face better and get out of our line and get a better view of Lundin. Q. And you say that he careful aim did take? A. Yes, sir. Q. And then did you hear the report? A. Yes, sir. Q. Now, then, after you the report did hear, did you right away know that Lundin was hit? A. No, sir. Q. How long after you the report did hear before you knew that the man on the table sleeping was hit? A. I didn't know that he was hit. I knew that he didn't get up, and I thought he must be shot. That is all I knew about it.

Counsel for the accused insists that it is the duty of the court in its sound discretion to allow the juror to ask any proper and competent question, but it was likewise the duty of the court in its sound discretion, with regard to the rights of the defendant, to determine whether or not the questions were proper and competent questions before allowing the same to be submitted to the witness, and not to allow incompetent questions to be asked, and that failure to object to this question involving the opinion of this witness was error. In support of this he cites typical authorities to the effect that it is a "well-established principle that the rejection of competent and material evidence, or the reception of incompetent and improper evidence, which is harmful to a defendant and excepted to, presents an error requiring reversal. Such a ruling affects the substantial rights of a defendant, even though the appellate court would, with the rejected evidence before it, or with the improper evidence excluded, still come to the same conclusion reached by the jury. The defendant has the right to insist that material and legal evidence offered by him shall be received and submitted to the jury, and to have illegal and improper evidence, which may be harmful, excluded, and have the opinion of the jury upon proper evi-

dence admitted in the case, and upon such evidence only. People v. Wood, 126 N. Y. 249, 27 N. E. 362; People v. Greenwall, 108 N. Y. 296, 15 N. E. 404. As was said by Earl, J., in the latter case: 'A person on trial for his life is entitled to all the advantages which the laws give him, and among them is the right to have his case submitted to an impartial jury upon competent evidence.'" Stokes v. People, 53 N. Y. 164; People v. Corey, 148 N. Y. 476, 42 N. E. 1066.

We are satisfied that as a matter of strict technical construction there is no error in this record entitling the accused to a new trial as a matter of right. Essentially the same matters as those here objected to had been previously testified to without objection or exception, as appears from the statement of testimony previously made, and were not assigned as error here. No objection was made to the question asked by the juryman, nor to the admission of the testimony in answer, nor was any motion made to strike it out, nor was any exception taken in any way thereto. Accordingly, assuming that the questions and testimony have all the legal faults counsel for the accused contends for, and that the decision of this case is to be rested upon technical rules, the appeal must fail. "Saving Questions for Review," 2 Current Law, 1590. And see Id. 1594, et seq.

That the inquiries were made by a juryman with the court's permission did not necessarily impose upon the trial judge the duty of conducting the defense by interposing objections based upon their not very improper form, because objections by his counsel might prejudice the defendant. We do not hold that the court's discretion in this regard might not be abused upon a different state of facts. There are cases in which it would be the more orderly practice for the trial court, in its discretion, to ask the juryman to indicate the point of his inquiry and then to see that the question is properly formulated, as by directing counsel to put it, so as to afford the usual opportunity for objection and exception. Indeed, there is ordinarily no occasion for a juryman to interrogate a witness. In the instant case, however, no abuse of discretion on the part of the trial court and no reversible error appear in this matter.

The decision in this case, however, is not based upon compliance or noncompliance with technical rules of practice or evidence. Such rules are primarily different from the constitutional guaranties, without the

strict observance of which punishment even by a properly constituted court is little better than the punishment by a mob. Matters of mere procedure, however, have no such sanctity. When a court exercises its traditional power to regulate a trial, to pass on the competency, materiality, or sufficiency of evidence, or the propriety of the form of a question, and to revise the action of a jury, it violates no constitutional right; nor does it when it confirms the verdict of a jury. Rules of practice and evidence are primarily designed to secure the orderly administration of the laws of the land. They serve their purpose so far as, and only so far as, they conduce to a fair trial. But, instead of serving as a means of securing justice, they have been made to usurp dominion as if their observance were the end to be attained. Decisions of many courts have determined controversies concerning them as if they were the constitutional requirements, as if the object of the law was their evolution into a perfect system, and as if the function of even the highest judicial tribunals was to secure their consistent enforcement.

Under the guise of protecting the "rights of the accused," this perversion in the use of these rules has been and must be the source of wrong, alike to the accused and to the public. For, on the one hand, cases involving human lives may arise in which an appellate court would properly feel that there was imposed on it the duty of setting aside a verdict of conviction and of granting a new trial for errors committed by the trial court resulting in an unfair trial of the defendant, although no objection or exception was made or taken to the improper admission or exclusion of evidence, or to the improper conduct or ruling of a trial court, because of the mistake or misconduct, neglect, or incompetency of his counsel. The strict application of practice rules would then make a new and fair trial impossible. On the other hand, the exaggeration of the value of such technicalities has opened the doors for the escape of unnumbered and undoubted criminals. "Some of the instances of its enforcement would seem incredible, even in the justice of a tribe of African fetish worshipers." 1 Wigmore, Ev. 73.

There is a current impression on part of the profession of law, and of the community in general, that all courts are hopelessly committed to this apotheosis of an artificial system, as repugnant to common sense

as it is subversive of common justice. In point of fact, this is far from being true. The original English rule was that erroneous admission or exclusion of evidence, duly objected to, would not be a basis for new trial if the rest of the testimony be sufficient to warrant the conclusion to which the jury have come. Later, and about 1835, a different rule came to be generally accepted, viz., that an error of ruling created per se for the defeated party a right to a new trial. It remained the law of England until it was reformed away for civil cases in 1875. In the United States this rule is the law in the majority of jurisdictions, but it is not sustained by the better opinion or reason (1 Wigmore, Ev. p. 71, § 21), and is distinctly not the law in this state.

In State v. Nelson, 91 Minn. 143, 144, 145, 97 N. W. 652, Brown, J., says: "New trials in criminal prosecutions have for many years been granted by the courts with too much liberality (3 Columbia Law Rev. 433), and to such an extent have the technical rights of accused persons been magnified and upheld, and that, too, in cases where guilt has been overwhelmingly shown, as to result in much public discontent, and to bring the administration of the criminal laws into disrespect. Errors of no vital consequence, at least not affecting materially the substantial rights of the accused, either in the admission or exclusion of evidence, in the instructions of the trial court to the jury, or alleged misconduct of the prosecuting attorney, have opened prison doors and liberated many criminals. This condition has caused peaceful and law-abiding citizens to become lawless, and to join in the barbarous method of punishing crime by a resort to the court of Judge Lynch. All such outrages of the law have been attributed in the main to the lax administration of the laws in the criminal courts, the gravity and tenacity with which they respect the alleged legal rights of the criminal, and the unnecessarily strict adherence to ancient forms and procedure. Remedies have been suggested, among others, that the right of appeal be taken away in such cases; but it is believed that the only appropriate way to quiet the public mind in this respect and restore confidence in the ability of the courts to administer justice, not only to the criminal, but to society and the state as well, and to overcome the tendency to resort to lynch law, is a prompt and speedy trial, conviction, and certain and unrelenting punishment of the guilty, unaccompanied by the long delays

usually incident to the administration of criminal laws, and unaccompanied, too, by too much respect for refined and subtle technicalities. New trials should be granted only where the substantial rights of the accused have been so violated as to make it reasonably clear that a fair trial was not had."

The present case, however, presents neither error nor unfair trial. The substantial rights of the accused have not been violated. We have examined with care, notwithstanding the waiver of counsel for the accused, all his assignments of error, and find all without merit. Throughout the entire case, the record shows, the trial court carefully followed each successive development of testimony, correctly ruled on every question raised by counsel, and so ordered that the result was an eminently just and impartial trial.

The counsel of the accused who tried the case before the jury, but who did not appear for him upon this appeal, was appointed by the court. He performed his difficult and painful duties with fidelity and ingenuity. So far as the testimony is concerned, the language of Porter, J., in a similar case (People v. Fernandez, 35 N. Y. 49, 59) is apt: "The circumstances which were established by evidence confessedly competent were so conclusive as to the guilt of the prisoner that no honest jury could refuse to convict him of the crime. * * * We are under no legal or moral obligation to assume that the jury might have rendered a false verdict * * * but for the erroneous admission of * * * evidence." The prosecuting attorney without error proved every step in the perpetration of the double felony from its beginning to its end, by testimony the most direct, complete, and conclusive, amounting to a substantial demonstration of the guilt, and of the degree of guilt, of the accused. Not only did four full-grown men, who in the possession of all their faculties had seen in the light held by the prisoner himself, in his presence and in the presence of each other, every act of the tragedy, testify without attack, impeachment, or inconsistency, to every brutal detail; not only were the revolver which shot the bullet and the bullet which was taken from the brain of the dead man produced, identified, and connected with the deceased; but he himself voluntarily took the stand and admitted the robbery and the shooting. There is ac-

cordingly no doubt that the judgment of the trial court should be, and it is hereby, affirmed; and it is hereby directed, in accordance with the statute (G. S. 1894, § 7391), that the sentence pronounced by the trial court be executed.

Judgment affirmed.