**STATE of Minnesota, Respondent,**

v.

**Gerard J. COSTELLO, Petitioner,
Appellant.**

**No. C7–00–436.**

Supreme Court of Minnesota.

June 13, 2002.

Theodora Gaitas (# 271810), Assistant
State Public Defender, Minneapolis, MN,
for Appellant.

Michael A. Hatch, Minnesota Attorney
General, Eileen Wells, Mankato City At-
torney, Christopher Cain (# 223797), As-
sistant Mankato City Attorney, Mankato,
MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

This appeal arises from the conviction of appellant Gerard J. Costello for aggravated driving under the influence of alcohol, driving under the influence of alcohol, driving after cancellation, and giving a false name to a peace officer. We granted review to decide whether the district court erred by allowing jurors to question witnesses during Costello's trial. The court of appeals held that the practice of questioning by jurors is allowed under the district court's inherent trial-management power and affirmed the convictions. We reverse and remand to the district court for a new trial.

On September 28, 1999, two Mankato police officers responded to reports of a disturbance in a boarding house. One of the officers, Officer Daniel Padilla, went to the back of the house to ensure that no one exited the house through the back door. As he came around the house, Officer Padilla observed appellant Costello backing a truck out of a parking space. He signaled for Costello to stop, and approached the vehicle to investigate. As he spoke with Costello, Officer Padilla noted an open, partially filled can of beer on the floor of the cab, and observed that Costello smelled of alcohol, his speech was slurred, and his eyes were bloodshot. When Officer Padilla asked for identification, Costello initially gave a false name and date of birth. After he was told that he would be charged for giving a false name to a peace officer, Costello gave his actual name and date of birth.

Officer Padilla ran the correct identification through dispatch and discovered that Costello's license had been cancelled as inimical to public safety. Costello was then arrested and ultimately charged with aggravated driving under the influence of alcohol, driving under the influence of alcohol, driving after cancellation, and giving a false name to a peace officer. At trial, Costello asserted the defense of necessity, arguing that he was driving only because he was afraid of some other tenants in the boarding house who had threatened to assault him.

Before trial began, the district court informed the parties of its intention to allow jurors to question witnesses during the trial. Costello lodged a blanket objection to the practice, and the state said that it had "[n]o objection to [Costello's] request." When the court noted, "In other words, you join in [Costello's] request," the prosecutor merely responded, "Well, I don't want to be too cooperative * * *." The record reflects that the court noted the objection, but did not engage in any further discussion of the matter.

In its preliminary instructions to the jury at Costello's trial, the court gave the following instruction:

Questions by jurors. In this trial you will be allowed to submit questions for the witnesses. This is a procedure that I'm applying on a case by case basis, so if you're in another trial, you may not be provided this opportunity. If you have a question for a particular witness, you must write it down. Unless your handwriting is very legible, please print. Don't sign the question. Signal the bailiff, who will bring your question to me. Now, keep in mind that your question must be submitted before the particular witness leaves the witness stand. In order to be sure that I'll not miss a question, before I excuse a witness I'll try to remember to make a general inquiry of you as to whether you have any questions. Sometimes I forget, so the

final burden is on you if you have a question, to make sure that I see your hand. But I also want to stress that it's not necessary for you to ask any questions, and I've had more than one trial where not one question was asked by a juror. All right? So, just an opportunity, that's all it is. I'll apply the same rules of evidence to any of your questions that I apply to those asked by the attorneys. If I decide that a particular question cannot be asked, I'll tell you. You shouldn't speculate as to why your question was not asked. And if I decide not to ask a particular question, I hope you won't interpret it as some sort of an adverse reflection upon you or the person asking it. Like I say, it's an opportunity. You may avail yourself of it; a lot of folks don't. And if you do, then the same rules apply and I'll let you know.

During the course of the trial, jurors submitted at least five questions to the court.[1] One question was redundant and one question was disallowed because of an objection by the state. Ultimately, the court posed three questions: one to Officer Padilla, one to Costello's girlfriend, and one to Costello himself.

The first question was posed to Officer Padilla after re-cross examination by the defense. Jurors had submitted two questions during his testimony: "When you first saw the pickup—did it appear to be moving with any urgency, as if to get away in a hurry?" and "Did [Costello] appear eager [to] get out of there (the parking lot, etc.)?" The court asked the first question:

Q: Officer, when you first saw the pickup, did it appear to be moving with any urgency as if to get away in a hurry?
A: No, it just appeared to be—it just had completed, it looked like, back—when I came around the corner of the house, the stalls are right in the back of the house. There's like three stalls, apparently, for parking at that house, and I just saw it backing, and then it stopped, and it was just going into gear to go forward, and I put my hand up. And no, it didn't seem to be moving in any urgency.

Costello was allowed to ask follow-up questions about whether the truck appeared to be in gear; the prosecutor declined to ask any follow-up questions.

The second question was posed to Costello's girlfriend after cross examination by the state. Jurors had submitted two written questions during her testimony: "Had either of the [other tenants] ever made any threats to you or [Costello] on any previous occasions?" and "Did you in any way inform [Costello] of [the other tenant's] threat to you and to him?" The prosecutor objected to the question about previous threats, and the court sustained the objection, stating that the question "gets a little too far afield on the issue at hand." The court did, however, ask the other question:

Q: I think you answered this question, but did you ever talk to Gerard Costello or warn him in regard to this threat from [other tenants]?
A: I warned him, yes.

Sua sponte, the court followed the juror's question with another question:

Q: How did you do that?

1. The court records contain evidence of an additional two written questions that were submitted by the jurors but not asked by the court, although the record is not clear whether the questions were objected to by counsel or rejected, sua sponte, by the judge: "Mr. Costello—were you carrying anything from the house to the pick up? (I'm wondering where the opened beer can came from.)" and "Was the Budweiser beer the 'Bush' [sic] brand of Budweiser?"

A: Through his boss * * *.

Q: Oh, you talked to [his boss]?

A: Yeah.

Again, Costello asked a follow-up question; the state declined to ask further questions.

The third written juror question was posed to Costello after redirect examination by defense counsel: "Mr. Costello, what was your intended destination when you attempted to leave the parking lot?" The court asked:

Q: What was your intended destination when you were attempting to leave the parking lot before Officer Padilla stopped you?

A: I had told Padilla that I was only going to go down about a half a block and park the truck and walk from there.

Neither party asked any follow-up questions to the third juror question.

Costello was convicted of aggravated driving under the influence of alcohol, driving under the influence of alcohol, driving after cancellation, and giving a false name to a peace officer. On appeal, the court of appeals affirmed the convictions, concluding that the practice of allowing juror questioning was within the district court's trial-management authority and would be reviewed on a case-by-case basis. *State v. Costello,* 620 N.W.2d 924, 927–28 (Minn. App.2001). Costello appealed to this court, arguing that juror questioning violated his right to a fair trial by an impartial jury under both the state and federal constitutions, and therefore resulted in reversible error.

■ Costello's appeal turns on a legal question, which we review de novo. *State v. Cheng,* 623 N.W.2d 252, 257 (Minn.2001). While the issue of whether a district court can permit jurors to question witnesses during criminal trials is one of first impression, in *State v. Crawford,* 96 Minn. 95, 104 N.W. 822 (1905), this court analyzed the effect of a spontaneous juror question on "the substantial rights of the defendant." *Id.* at 99, 104 N.W. at 823. While the conviction was upheld despite a question asked by a juror during trial, the facts in *Crawford* are distinguishable from the facts in this case both because the questioning in *Crawford* was not solicited by the court and the defendant in that case did not raise an objection. *Id.* at 100, 104 N.W. at 824. Moreover, the policies underlying the court's reasoning in *Crawford*—suspicion that reversal based on technical court rules could cause "peaceful and law-abiding citizens to become lawless, and to join in the barbarous method of punishing crime by a resort to the court of Judge Lynch"—are, thankfully, less apposite today. *Id.* at 102, 104 N.W. at 825. Therefore, the issues we must address are, first, whether the district court's juror-questioning policy lay within its inherent trial-management authority; second, whether such a policy can be applied without upsetting the balance between the state and defendants that is guaranteed by an adversarial system; and, third, the effect of juror questioning on this particular defendant's case.

■ A district court clearly has the inherent power to "govern[ ] that which is essential to [its] existence, dignity, and function," but that discretion is only properly exercised when it is a means to "the disposition of individual cases * * * 'conformable to the laws.'" *In re Clerk of Lyon County Courts' Compensation,* 308 Minn. 172, 176–77, 241 N.W.2d 781, 784 (1976) (quoting Minn. Const. art. 1, § 8). This court has not yet decided, however, whether allowing juror questioning is "conformable to the laws." [2]

---

**2.** This is not to suggest that every district court procedure on which this court has not

We turn then to the question of whether juror questioning undermines the adversarial system. The question is best analyzed against the historical background that gives us an appreciation of our current system of criminal justice. The process by which criminal matters have been handled has evolved from an inquisitorial system to an adversarial system. According to Blackstone, defendants charged at common law with capital crimes were not afforded counsel "unless some point of law shall arise proper to be debated." 4 William Blackstone, *Commentaries* *356. Both the magistrate and the jurors were authorized to question witnesses, and very few rules governed the introduction of evidence. Stephen Landsman, *The Rise of the Contentious Spirit: Adversary Procedure in Eighteenth Century England,* 75 Cornell L.Rev. 497, 506 (1990). While most defendants could not retain counsel, challenge evidence, or even call witnesses who would be permitted to testify under oath, the common-law criminal judicial system emphasized law and order in a society that predated the evolution of the defense bar. *Id.* at 506–09.

Over time, British courts evolved toward a model characterized by greater respect for defendants' rights to fair procedure, more restrictive standards of evidence, and greater independence of the litigants. Although defense counsel were not allowed to take charge of felony defenses until 1696, they increasingly shaped the role of litigation and advocated changes that would benefit their clients. *Id.* at 508, 520–24. And while Blackstone describes a system characterized by questions from every participant in the action,[3] these questions were asked increasingly by lawyers. *Id.* at 536–37. While defendants retained the power to question witnesses, they increasingly deferred to professional counsel. *Id.* at 557–64. Accordingly, the very manner in which evidence was proffered and accepted became shaped by defense counsel through the art of cross-examination and increasing emphasis on the quality of evidence, such as the creation of the hearsay rule. *Id.* at 539–42, 564–72. Thus, the American system developed from a model that was itself in the process of adopting the adversarial system we know today.

In America, the spirit of the adversarial system became firmly rooted and constitutionally protected by the Sixth Amendment to the United States Constitution, which guarantees the right to counsel.[4] Today, the modern adversarial system retains questioning by parties, but the role of jurors has evolved from active investigators to passive, neutral observers of the testimony elicited by the advocates for the state and the defendant. *See* Jeffrey S. Berkowitz, *Breaking the Silence: Should Jurors be Allowed to Question Witnesses*

---

ruled is in question. Many district court procedures are properly left to the discretion of the district court. The particular procedure at issue here has been the subject of debate and courts have reached different conclusions on its permissibility.

3. Blackstone wrote, "[T]he occasional questions of the judge, the jury, and the counsel, propounded to the witnesses on a sudden, will sift out the truth much better than a formal set of interrogatories * * *." 3 Blackstone, *Commentaries* *373.

4. The right to assistance of counsel is so fundamental to the American system of justice that the Sixth Amendment has been interpreted to guarantee the right to counsel for indigent defendants who face incarceration. *Gideon v. Wainwright,* 372 U.S. 335, 344–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *see also, e.g., State v. Borst,* 278 Minn. 388, 397, 154 N.W.2d 888, 894 (1967) (exercising supervisory power to require the appointment of counsel to represent indigent misdemeanor defendants).

*During Trial?*, 44 Vand. L.Rev. 117, 124 (1991).

In the late 1980s, however, some academics began proposing a return to the practice of juror questioning and the practice found its way into the courts. Supporters of such questioning tout its perceived advantages, including: (1) trials are a search for truth and juror questions facilitate that search; (2) jurors may need clarification in complex cases to understand the facts; (3) the jury is the finder of fact and these questions help the jury perform that function; (4) increased juror attentiveness; and (5) increased juror satisfaction. *See, e.g., State v. Hays*, 256 Kan. 48, 883 P.2d 1093, 1102 (1994); Berkowitz, 44 Vand. L.Rev. at 120–22; Steven D. Penrod & Larry Heuer, *Tweaking Commonsense: Assessing Aids to Jury Decision Making*, 3 Psychol. Pub. Pol'y & L. 259, 274–76 (1997).

While the practice of juror questioning has not been without controversy, courts on the whole have not rejected it. Juror questioning is now supported by the American Bar Association and is allowed, in some form or another, in federal courts and in the majority of states. *See generally Civil Trial Practice Standards* 4, at 6 (1998); Kara Lundy, Note, *Juror Questioning of Witnesses*, 85 Minn. L.Rev.2007, 2021–22 n. 105 & 106 (2001).

The apparent prevalence of juror questioning is misleading, however, because even when allowed, the practice is rarely encouraged. *See, e.g., United States v. Thompson*, 76 F.3d 442, 448 (2d Cir.1996) (stating "we have strongly discouraged the practice except in extraordinary or compelling circumstances, because such questioning tends to impair juror neutrality during the trial and to encourage premature deliberations"). Further, in addition to tepid support for juror questioning, many states place significant procedural limitations on juror questioning. *See, e.g., Hays*, 883 P.2d at 1102 (enumerating commonly recommended procedures).[5] Therefore, it should be recognized that even though the practice is allowed in the majority of jurisdictions, most courts have been reluctant to unreservedly encourage it.

Nonetheless, although support for juror questioning has been less than ardent, only four states have prohibited the practice completely in criminal trials. *See Johnson v. State*, 270 Ga. 234, 507 S.E.2d 737, 742 (1998) ("Clearly, a juror is not permitted to question a witness."); *Wharton v. State*, 734 So.2d 985, 990 (Miss.1998) (holding that "juror interrogation is no longer to be left to the discretion of the trial court, but rather is a practice that is condemned and outright forbidden by this Court"); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377, 380 (1991) (noting "[a] change in this sys-

**5.** To alleviate the serious concern surrounding this issue, many states have adopted procedural safeguards. For example, in a full analysis of the issue, the Kansas Supreme Court noted the following commonly recommended procedures: (1) the court should inform jurors at the beginning of the trial that they will be allowed to question the witnesses; (2) the court should not invite questions until a juror first asks for clarification; (3) questions should be allowed only on important points or for clarification; (4) questions should be submitted in writing; (5) jurors should not question witnesses directly; (6) questions should be submitted by individual jurors without discussion among the other jurors; (7) counsel should be able to make objections outside the presence of jurors; (8) the court should rule on objections and relevance before asking the questions; (9) the court should instruct the jury that no inference should be drawn if a submitted question is not asked; (10) only the court should ask the questions, although counsel may ask the question if there are no objections; and (11) counsel should have the opportunity to ask follow-up questions. *Hays*, 883 P.2d at 1100.

tem whereby jurors become advocates and possible antagonists of the witnesses does not on its face suggest a fairer or more reliable truth-seeking procedure;" and "the judicial process is better served by the time-honored practice of counsel eliciting evidence which is heard, evaluated, and acted upon by jurors who have no investment in obtaining answers to questions they have posed"); *Morrison v. State*, 845 S.W.2d 882, 888–89 (Tex.Crim.App.1992). Finally, we note that seven states have apparently never addressed this issue. *Lundy*, 85 Minn. L.Rev. at 2022 n. 109.

Thus, like the jurisdictions that have decided the issue before us, in this appeal we too must decide whether allowing jurors to question witnesses enhances or detracts from the fair administration of justice in Minnesota. We have jealously guarded the role of juries in our criminal justice system, and many cases reflect our concern with maintaining the impartiality and independence of the jury. In *State v. Porter*, 526 N.W.2d 359 (Minn.1995), we characterized juror independence as the "heart of the jury system," and reversed a conviction when the prosecutor in closing argument attempted to impinge on juror independence by playing to jurors' emotions and fears. *Id.* at 364, 366. Similarly, we have stated that arguments that ask jurors to put themselves in the shoes of the victim are generally improper, *State v. Johnson*, 324 N.W.2d 199, 202 (Minn.1982), and we have condemned arguments that invite the jury to speculate about the facts, *State v. Thompson*, 578 N.W.2d 734, 742 (Minn.1998). Prosecutors also may not distort the burden of proof to the jury. *State v. Thaggard*, 527 N.W.2d 804, 812 (Minn.1995). Indeed, we have condemned

a prosecutor's suggestion to the jury that its role was to determine if the evidence was sufficient to convict rather than whether the state had proved its case beyond a reasonable doubt—a distinction that laypeople may find subtle.[6] *Id.* Each of these cases reflects a deep concern that jurors maintain independence from those involved in the case, objectivity with respect to the evidence, and a clear understanding of their role as deciding whether the state has met its burden of proof. Juror questioning must be evaluated in light of its effect on these principles.

To maintain independence and objectivity, it is a tenet of our criminal justice system that adjudicators should "postpone or suspend the final formation of * * * opinion until the parties have 'had their day in court' and have presented *all* the information that they consider relevant in the context of adjudication." Boštjan M. Zupančič, *Truth and Impartiality in Criminal Process*, 7 J. Contemp. L. 39, 70 (1982). This principle is particularly important in criminal trials, in which the state presents all of its evidence first, and it is sometimes only after several days of listening to mounting evidence against a defendant that the jury may hear any exculpatory evidence. Thus, in Minnesota, jurors are instructed: "You should keep an open mind about all the evidence until the end of the trial, until you have heard the final arguments of the attorneys, and until I have instructed you in the law." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 1.02 (4th ed.1999). But in order to ask a question, a juror must first develop a hypothesis or, at the very least, respond to a perceived flaw in a party's

---

**6.** As we recognized in *State v. Salitros*, 499 N.W.2d 815 (Minn.1993), improper arguments to the jury can and are made by both the state and the defense, and the fact that most of the case law in this area involves misconduct by prosecutors simply reflects that, generally speaking, only the defendant can appeal in a criminal case. *Id.* at 817.

presentation of the case before the time to deliberate has arrived.

To the degree jurors are encouraged to ask questions about facts and legal issues, they are encouraged to form "at least a prior tentative opinion because one cannot investigate unless one has a hypothesis about what happened in the particular criminal case." Zupančič, 7 J. Contemp. L. at 70. Therefore, with such encouragement, there is an increased risk that jurors will "inevitably * * * draw conclusions or settle on a given legal theory before the parties have completed their presentations, and before the court has instructed the jury on the law of the case." *Morrison,* 845 S.W.2d at 887. While the state argues that it is "human nature to *test* one's hypothesis," the traditional system's procedures and instructions have been crafted to limit such activities until both sides have presented their arguments and the jury has been instructed on the relevant law. As the Texas Court of Criminal Appeals noted in *Morrison,*[7] "Although it is impossible to guarantee that jurors will remain open-minded until the presentation of all of the evidence and instructions, passive detachment increases that probability." 845 S.W.2d at 886 (citing *United States v. Johnson,* 892 F.2d 707, 713 (8th Cir.1989) (Lay, J., concurring)).

■ In addition to our concern about the impact that juror questioning will have on juror impartiality, we also are concerned that the practice may affect the

burden of proof and production. Due process requires that the state prove beyond a reasonable doubt the existence of every element of the crime charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *State v. Clausen,* 493 N.W.2d 113, 116 (Minn.1992). A defendant's due process rights are violated if the burden to disprove the existence of any element of the crime charged is shifted to the defendant. *Mullaney v. Wilbur,* 421 U.S. 684, 701–02, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *State v. Auchampach,* 540 N.W.2d 808, 816 (Minn.1995); *see also Williams v. Florida,* 399 U.S. 78, 112, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (Black, J., concurring in part and dissenting in part) (stating a defendant "has an absolute, unqualified right to compel the State to investigate its own case, find its own witnesses, prove its own facts, and convince the jury through its own resources"). Allowing jurors to pose questions could, in some cases, elicit testimony from a witness that sufficiently proves an element of a crime, therefore relieving the state of its burden.[8]

The assistance provided to the state by juror questioning may be direct or indirect. Juror questioning can directly assist the prosecution when—as the state approvingly exclaimed in its brief—"evidence could be revealed by a juror question!" Juror questioning can indirectly assist the prosecution when it simply illuminates a facet of the case that interests the jurors.[9]

---

**7.** Because the Texas Court of Criminal Appeals has final appellate jurisdiction over criminal cases in the state of Texas, Tex. Const. Art. 5, § 5(a), its opinion is similarly persuasive as any other state court of final appellate review. *See Thompson v. State,* 384 N.W.2d 461, 463 (Minn.1986) (citing the Texas Court of Criminal Appeals for one interpretation of a United States Supreme Court case).

**8.** In this case, the jurors' questions went to Costello's affirmative defense, but it is not difficult to imagine a scenario where juror questions help prove the state's case.

**9.** In *Morrison,* for example, the defendant was accused of murdering the victim in a fight that broke out during a drug transaction. 845 S.W.2d at 883 n. 2. At trial, a detective testified about blood he found in the victim's house. *Id.* A juror submitted a question about whether any of the blood belonged to the

While surveys have indicated that assistance to the prosecution is not a common occurrence, Penrod & Heuer, 3 Psychol. Pub. Pol'y & L. at 278–79, that is, in fact, what occurred here. At oral argument, counsel for the state—the prosecutor in Costello's trial—described his experience with juror questions:

> Counsel: I was ambivalent one way or the other. I said, "This is a slam-dunk case. We're not going to have anything to worry about." And then when I saw the very first question, which was "Was the Defendant attempting to leave or showing—indicating that he was leaving with some form of urgency," right away, I thought, 'They're taking his affirmative defense—uh, defense, very seriously, and now I have to respond to it.' So, from my standpoint it helped me and I think it helped the defense attorney because now he knows exactly that they're seriously considering this even despite the fact that he deliberately lied about his identity, now they're thinking—
>
> Court: Counsel, isn't that a problem? * * * You recognize that the jury was taking something either seriously or not seriously, and you respond to it as an advocate, it seems to me that that's changed the dynamic of the trial right there.
>
> Counsel: Oh, it has, it has. The State's position on this, your Honor, is that—
>
> * * * *
>
> Court: Maybe the prosecutor was asleep at the switch and was going to leave some essential element out. All of

a sudden, you have the jury participating * * * or helping the state more than the defendant * * * [or] in this context, [help] the state meet its burden.

> Counsel: You could look it that way. It's the state's position that fifty percent of the time it's going to assist the defense though, as well. It does change the dynamics.

The state's candid admission that the jurors' questions convinced him to respond to the defendant's affirmative defense highlights how the practice of juror questioning can affect the parties' meeting the burden of proof and forces us to acknowledge that by allowing questioning, the role of the jury is changed. Whether one side is benefited more than the other is of secondary concern. Our concern is not in equalizing the number of notches in the belts of advocates but, rather, whether the jury is being lured into a role that is inconsistent with its responsibility to be an impartial arbiter of justice. As we have previously said:

> [T]he jury's role is not to enforce the law or teach defendants lessons or make statements to the public or to "let the word go forth"; its role is limited to deciding dispassionately whether the state has met its burden in the case at hand of proving the defendant guilty beyond a reasonable doubt.

*Salitros*, 499 N.W.2d at 819. Because the practice of juror questioning can actively assist the state in meeting its burden, the jurors' role may be compromised.[10]

---

defendant. *Id.* Defense counsel objected on hearsay grounds, and the question was never asked; but the court did allow the state to call the witness back to the stand to testify that the defendant did not have any visible wounds, scratches, or injuries. *Id.*

10. Apparently the dissent is not bothered by the occasional shifting of burdens as long as the judge follows a "safeguards" protocol.

This approach is troubling as it elevates form over substance and ignores the substance of the majority's concern. Protocols, as used in this very case, do not provide sufficient protection against the serious danger of jurors stepping into the important, albeit decidedly different, roles of the parties. Further, the protocols set forth by the dissent provide no guidance as to when questioning should be

In sum, our concern about allowing jurors to question witnesses is two-fold. First, the opportunity to pose questions may prevent jurors from keeping an open mind until all the evidence has been presented. Second, the opportunity to pose questions may upset the burden of production and persuasion in a criminal trial. We believe the passive-juror system minimizes these problems because jurors are (1) not enticed to form hypotheses or judgments about missing testimony; and are (2) prevented from affecting the production of evidence.

Nonetheless, we recognize that the primary reason advanced for juror questioning is that the practice enhances the factfinding function. Any process that enhances the factfinding ability of the jury should not be easily dismissed, as factfinding remains a primary function of the criminal justice system. However, the truth-finding goal is balanced against the rights of the accused and concerns about individual freedom.[11] As Justice Black noted, "A criminal trial is in part a search for truth. But it is also a system designed to protect 'freedom' by insuring that no one is criminally punished unless the State has first succeeded in the admittedly difficult task of convincing a jury that the defendant is guilty." *Williams*, 399 U.S. at 113, 90 S.Ct. 1893 (concurring in part and dissenting in part). Specifically in the context of juror questioning, we agree with the Texas Court of Criminal Appeals, which noted in *Morrison*, "Due process and those individual rights that are fundamental to our quality of life co-exist with, and at times override, the truth-finding function." 845 S.W.2d at 884. Therefore, we conclude that maintaining the neutral role of jurors in an adversarial system outweighs whatever enhancement to the truthfinding function that juror questioning allows.

Our grave concerns regarding the effect juror questioning has on the rights of the parties are not abated by research on the effects of juror questioning on the truth-finding mission. Two surveys—one national and one based in Wisconsin— reached the same conclusion: While jurors are quite satisfied with their jury experiences, this assessment "was not influenced by the presence or absence of juror questions." Penrod & Heuer, 3 Psychol. Pub.

---

allowed. Indeed, the dissent would allow juror questioning in every trial if a trial judge would so allow—even though the dissent too believes that such "questioning should be the exception."

**11.** Thus, some kinds of "truth" are kept from the factfinder. *State v. VanWagner*, 504 N.W.2d 746, 750 (Minn.1993) (noting that hearsay and *Spreigl* evidence are sometimes properly excluded despite impeding truthfinding). We stated in *VanWagner* that "[t]he prosecutor is bound to seek *that truth which is governed by the rules of evidence.*" 504 N.W.2d at 750 (emphasis added); *see also* Minn. R. Evid. 403 (allowing the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or considerations of judicial efficiency). Similarly, the privilege against self-incrimination impedes the truth-finding function of criminal courts. *See Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). And prophylactic rules to protect defendants' rights may inhibit them from speaking freely and exposing the truth. *See State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994) (requiring peace officers to record interrogations). Additionally, privileges limit the production of evidence that could be helpful to a jury in determining the "truth." *See, e.g., Kobluk v. Univ. of Minnesota*, 574 N.W.2d 436, 440 (Minn.1998) (attorney-client privilege); *In re D.M.C.*, 331 N.W.2d 236, 238 (Minn.1983) (medical privilege); *State v. Clark*, 296 N.W.2d 372, 376 (Minn.1980) (marital-communications privilege); *In re Swenson*, 183 Minn. 602, 603, 237 N.W. 589, 590 (1931) (clergy privilege).

Pol'y & L. at 276. Further, survey questions revealed that "jurors' satisfaction with their verdict and their attitudes toward jury service were unaffected by their opportunity to ask questions." *Id.; see also* Larry Heuer & Steven Penrod, *Increasing Juror Participation in Trials Through Note Taking and Question Asking,* 79 Judicature 260, 256–61 (1996) (discussing the Wisconsin survey).

Finally, it is worth noting that the state advances few compelling arguments in support of taking such a risk with our traditional jury system. The state did not oppose Costello's objection at trial,[12] and only defended the practice on appeal. In its briefs to this court, the state points to only the possibility that juror questioning "provide[s] information and [insight] to juror concerns." In this way, the state argues, "[b]oth the prosecution and defense can address a juror's concerns while the case is evolving"—an argument that underscores the fact that juror questioning can impact, in a very real way, the adversarial nature of our criminal justice system. The less-than—enthusiastic tolerance of juror questioning by many of our sister states, and the limitations created in an attempt to harness the dangers implicit in such questioning, do not erase our doubts about the assertion that juror questioning is simply a matter of trial management. As Judge Lay implied in a concurring opinion, juror questioning goes to the very heart of our adversarial system of justice:

> The fundamental problem with juror questions lies in the gross distortion of the adversary system and the misconception of the role of the jury as a neutral factfinder in the adversary process. Those who doubt the value of the adversary system or who question its continuance will not object to distortion of the jury's role. However, as long as we adhere to an adversary system of justice, the neutrality and objectivity of the juror must be sacrosanct.

*Johnson,* 892 F.2d at 713 (Lay, J., concurring).

While the debate over juror questioning will undoubtedly continue, we are persuaded that the exact effect of such questioning is not quantifiable, and the inherent risks so significant that the practice must be proscribed.[13] *See Morrison,* 845 S.W.2d at 886–89; *Zima,* 468 N.W.2d at 379–80. Therefore, to protect the neutrality and impartiality of jurors—both critical to the fair administration of justice—we exercise our supervisory power and hold that no court shall permit jurors to question witnesses in a criminal trial.[14] *See Scales,* 518 N.W.2d at 592 (recognizing supervisory power over criminal trials "to insure the fair administration of justice" (citing *Borst,* 278 Minn. at 397, 154 N.W.2d at 894)); *see also VanWagner,* 504 N.W.2d at 750 (stating that we exercise our super-

12. After Costello stated he did not want the jurors to ask questions and placed a blanket objection on the record, the district court asked the state if it had "[a]ny comments on that issue?" The state replied, "No objection to [Costello's] request, your Honor."

13. In large part, the dissent bases its support of allowing juror questioning on the raw numbers—that is, the fact that a majority of appellate courts that have addressed the issue have not barred district courts from allowing

juror questioning. This narrow focus ignores the fact that while many appellate courts have begrudgingly allowed questioning in the name of discretion, the vast majority of trial judges do not allow the practice. And for good reason.

14. Because juror questioning of witnesses is proscribed under our supervisory power, we need not reach Costello's constitutional claims.

visory power to protect the "integrity of the factfinding process itself").

■ Finally, having determined that the district court erred in allowing juror questioning, the state urges this court to adopt a harmless error standard, arguing that even if the district court erred in allowing questions, neither the procedure nor the particular questions posed in this case affected the verdict, and therefore a new trial is not warranted. *See State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997) ("If the verdict rendered is 'surely unattributable' to the error, then the error is harmless beyond a reasonable doubt and the conviction stands."). We disagree. Because a court rule allowing juror questions can affect the outcome of a criminal case in subtle ways that go directly to the neutrality and impartiality of a juror, the error here must be analyzed differently than in cases where jurors spontaneously ask to question witnesses. *Cf. Crawford*, 96 Minn. at 103, 104 N.W. at 825. In similarly rejecting a harmless error standard of review, the Texas Court of Criminal Appeals noted the difficulty of discerning the effect of jury questioning on a guilty verdict:

> Where the role of the jury as a neutral fact-finding body is significantly modified, the underpinnings of our system, designed to ensure trial by a fair and impartial jury are likewise compromised. A determination of harm in this context is virtually impossible. Accordingly, we hold that the practice of permitting jurors to become active participants in the solicitation of evidence by questioning witnesses is not subject to a harm analysis.

*Morrison*, 845 S.W.2d at 889.

The rationale in *Morrison* illuminates why harmless error analysis is unsuited to this type of error: because juror questions may imperceptibly affect the production of evidence, the presentation of the state's case, and the jury's deliberations, it is impossible for an appellate court to infer from a record that the verdict rendered is "surely unattributable" to the error. *See Juarez*, 572 N.W.2d at 292. Juror questioning leads to "unfairness of a subtle and psychological nature that is difficult to identify with particularity." *Johnson*, 892 F.2d at 711 n. 1 (Lay, J., concurring). Thus, harmless error analysis is inappropriate not because of the magnitude of the error, but because it is impossible to quantify the effects of the error.

Accordingly, as an exercise of our supervisory power, we hold that no court shall permit juror questioning during criminal trials. Further, because the effect of such questioning is not quantifiable and the appellant raised a timely objection to the district court's practice, thereby preserving the issue for appeal, the defendant must be given a new trial. This holding applies both to the instant case and prospectively to similar cases where the issue has been preserved.

Reversed and remanded to the district court for a new trial.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. While I conclude that the practice of juror questioning should be discouraged, I am unable to ascertain a basis for its total prohibition under our supervisory powers or under the federal or state constitutions. At first blush, the majority appears to have provided a basis for the total prohibition of juror questioning using our supervisory powers. However, the logical foundation of the opinion rests on the debatable premise that jurors must be passive to be impartial. It also rests on the notion, rejected by the federal system and an overwhelm-

ing majority of other states, that safeguards used to insure the integrity of the judicial process from any potential problems of juror questioning are so inadequate that the only solution is the total elimination of the practice. While I understand the concerns, and even the anxiety, that underlie the majority's holding, the prohibition of juror questioning is an unnecessary solution to the concerns raised, particularly in light of the available safeguards. Therefore, even though I conclude that juror questioning should be the exception, I would hold that, subject to certain safeguards, the practice is permissible.

The majority begins its analysis by explaining that the role of jurors is to be passive, neutral observers. According to the majority, jurors maintain their independence and objectivity by waiting to form an opinion until all the evidence has been received. But the majority then goes on to conclude that asking any question is contrary to the passive, neutral role of jurors because asking a question requires a juror to develop a hypothesis or identify a flaw with one party's theory.

The majority's conclusion that a juror who raises a question can no longer be impartial because she has a hypothesis in mind or has identified a flaw in the evidence is based on (1) an article by Böstjan M. Zupančič, a former visiting professor at Fordham University School of Law,[1] and (2) an opinion of the Texas Court of Criminal Appeals. According to the majority, Zupančič argues that jurors who ask questions are encouraged to form a prior tentative opinion because "one cannot investigate unless one has a hypothesis about what happened in the particular criminal case." Bostjan M. Zupančič, *Truth and Impartiality in Criminal Process*, 7 J. Contemp. L. 39, 70 (1982). The majority

also bases its conclusion on a statement by the Texas Court of Criminal Appeals. More particularly, that court stated that passive detachment encourages the probability that jurors will remain open-minded until the presentation of all the evidence and that jurors who ask questions draw conclusions or settle on a given legal theory before the parties have completed their case presentations. *Morrison v. State*, 845 S.W.2d 882, 887 (Tex.Crim.App.1992).

In my view, the majority's reliance on Professor Zupančič's article and the opinion of the Texas Court of Criminal Appeals is insufficient to justify the result reached here. The article by Zupančič does not specifically address the issue of questioning by jurors. Rather, it discusses the issue of investigation and impartiality in the abstract sense. The decision of the Texas Court of Criminal Appeals is based on the argument that juror questioning undermines the ability of jurors to be neutral fact-finders. But the authority cited by the Texas court for this proposition are mere assertions by the Fourth and Eighth Circuits that juror questioning undermines juror impartiality. *See United States v. Johnson*, 892 F.2d 707, 713 (8th Cir.1989) (Lay, J., concurring); *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 516–17 (4th Cir.1985). Notably, all of the federal courts to address the issue of juror questioning, including the Fourth and Eighth Circuits, have permitted it subject to certain safeguards. *Johnson*, 892 F.2d at 710; *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir.1986). None has utilized the assertion that juror questioning undermines juror impartiality to eliminate the practice altogether.

Not only do I find the authority cited by the majority unconvincing, I also find that the majority's assumption that jurors must

---

**1.** Zupančič is currently an elected judge on the European Human Rights Court.

be passive to be impartial is at odds with both the adversary system and the process of rational intellectual inquiry used by jurors. Under the adversary system, the parties begin the trial process by making opening statements identifying their respective case theories and demonstrating how the evidence will support those theories. Throughout the trial, jurors evaluate each piece of evidence to determine the extent to which it supports the alternative case theories. Jurors constantly evaluate the evidence during the trial, but make their ultimate decision after all of the evidence has been received. Part of this evaluation process contemplates that each juror will constantly ask herself questions about the flaws in the evidence and consider which party's theory the evidence supports.

Thus, contrary to the majority's argument that jurors are passive recipients of information, jurors continuously evaluate the evidence. When jurors ask themselves questions, it is appropriate for them to have the respective case theories in mind or to be thinking about the flaws in the evidence. Indeed, the parties themselves have provided the jurors with the theories and hypotheses and likely have identified the flaws in the evidence. Because jurors engage in analytical thinking throughout the trial, thinking of a question does not automatically undermine a juror's impartiality.

In addition to the majority's concern about the impact of juror questioning on impartiality, the majority is also concerned that allowing jurors to pose questions could elicit testimony from a witness that might tend to prove an element of a crime, thus relieving the state of its burden. I share this concern. However, the safeguard of the judge reviewing the written question before it is posed to the witness should be adequate to ensure that the

sensitive balance in areas of burden of proof will not be upset. Thus, there is no need to totally prohibit the practice, particularly in light of the fact that, as the majority acknowledges, it is not a common occurrence for juror questioning to assist the prosecution in its burden of proof. Indeed, only four states have absolutely prohibited juror questioning in criminal trials while the vast majority of states as well as the federal system have permitted juror questioning subject to certain safeguards. *See State v. Hays*, 256 Kan. 48, 883 P.2d 1093, 1097–1100 (1994) (reviewing the extent to which juror questioning is permitted in state and federal criminal trials).

A court should not encourage or actively solicit questions. However, if a juror does pose a question, I would impose the following safeguards to insure the integrity of the judicial process. A court should permit questions only for purposes of clarification. Questions should be submitted in writing to the court in a nonintrusive manner. Questions should be raised by the jurors without discussion with the other jurors. The testimony of witnesses should not be interrupted by questions from jurors. The court should determine the propriety of the question. The court should also decide when the question should be asked and the court itself should pose the question. Counsel should be afforded the opportunity to object to the question outside the presence of the jury. When appropriate, the court should instruct the jury not to draw inferences from the fact that a submitted question is not asked. Finally, counsel should be given the opportunity to further examine the witness after the juror's question is posed. If these safeguards are followed, the majority's concerns that juror questioning undermines juror impartiality and alters the burden of proof and production should be alleviated.

In the end, I conclude that it is not necessary to totally prohibit juror questioning to maintain the integrity and fairness of the judicial process. Instead, while discouraging its use, we can allow the practice subject to procedural safeguards. Accordingly, I would hold that juror questioning is permissible within the sound discretion of the district court subject to the nonexclusive list of procedural safeguards I have set forth above. I would therefore affirm the court of appeals by holding that the district court did not abuse its discretion when it permitted individual jurors to submit questions for witnesses.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.